510 F.2d 198
 166 U.S.App.D.C. 245
 LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Northern States Power Company, Intervenor.
NORTHERN ENVIRONMENTAL COUNCIL, INC., et al., Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent,
Northern States Power Company, Intervenor.
 Nos. 73--2063, 73--2130.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 16, 1974.
Decided March 21, 1975.
 
 L. Graeme Bell, III, Washington, D.C., and Larry B. Leventhal, Minneapolis, Minn., of the bar of the Supreme Court of Minnesota, pro hac vice, by special leave of court, for petitioner in No. 73--2063.
 Romulo L. Diaz, Jr., Atty., F.P.C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F.P.C., were on the brief, for respondent.
 William J. Madden, Jr., Washington, D.C., with whom Paul T. Nowak, Jr., Washington, D.C., was on the brief, for intervenor Northern States Power Co.
 John M. Wiley, Wausau, Wis., and Roger L. Gette, Devils Lake, N.D., were on the brief for petitioner Great Lakes Inter-Tribal Council, Inc. in No. 73--2130.
 Edward Berlin, Washington, D.C., entered an appearance for petitioner Northern Environmental Council, Inc. in No. 73--2130.
 Before WRIGHT, MacKINNON and ROBB, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 Concurring and dissenting opinion filed by Circuit Judge maCKINNON.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 Petitioners seek review of the Federal Power Commission's Opinion No. 664,[1] which held that the Commission has authority, under the relicensing section of the Federal Power Act,[2] to grant a new long-term license or an interim annual license for FPC Project No. 108 despite the refusal of petitioner Lac Courte Oreilles Band of Lake Superior Chippewa Indians (the Band) to consent to further use by the licensee (intervenor Northern States Power Company (Northern States)) of tribal lands underlying the project. Petitioners also object to the Commission's issuance of annual licenses for Project No. 108 in 1972 and 1973. We hold that, under the circumstances of this case, the FPC was required to issue the annual licenses to the intervenor. In light of this disposition we hold that, pending the continuing administrative proceedings described below,[3] the question of the Commission's authority to license tribal lands notwithstanding tribal unwillingness to assent to such licensing is not ripe for review, although we believe the Commission premised its holding on an erroneous assumption and should therefore reevaluate its opinion, taking account of any relevant material being developed in the current proceedings.
 
 
 2
 * Prior to expiration of the original license in 1971, Northern States filed with the FPC an application for a new license. No other license applications to operate Project No. 108 have been filed, although the United States Department of Agriculture, Forest Service, and the United States Department of the Interior have recommended that the United States take over, or 'recapture,' operation and maintenance of Project No. 108 pursuant to Section 14 of the Federal Power Act.[5] Petitioners, who intervened[6] in the hearings concerning the recapture-relicensing issue,[7] have expressed their desire for federal recapture of the project[8] while asserting their objections to Northern States' operation for eventual power generating purposes.[9]
 
 
 3
 In petitioning to intervene before the Commission in the recapture-relicensing proceeding, the Band maintained that, pursuant to Section 16 of the Indian Reorganization Act of 1934,[10] it had the power to prevent any unwanted use of tribal lands by a Commission licensee, and that, since the existence and operation of Project No. 108 disrupted the Band's culture, affronted its respect for the environment, and prevented the growth of the Band's traditional staple, wild rice, it denied its permission for further use of its land for the project. Moreover, the Band claimed that issuance of any license over this denial would be contrary to the terms of the Treaty of 1854 which established the Lac Courte Oreilles Reservation; since the Commission purportedly could not therefore make the requisite finding under Section 4(e) of the Federal Power Act that 'the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired,'[11] it allegedly lacked jurisdiction to issue a new license. Based on these assertions, the Band moved to restrict all future hearings on Project No. 108 to the issue of federal recapture, and to exclude any consideration of Northern States' application for a new license. The Commission denied this motion,[12] and that ruling was not appealed.
 
 
 4
 During the course of these still pending recapture-relicensing proceedings, the Commission's secretary, acting pursuant to Section 15(a) of the Federal Power Act,[13] issued interim annual licenses to Northern States in August of 1971, 1972, and 1973. On September 1, 1972 the Band filed an application for rehearing concerning the secretary's public notice that the second of these annual licenses for Project No. 108 was issued to Northern States for the period August 8, 1972 to August 7, 1973.[14] In granting the motion for rehearing, the Commission directed the parties to submit briefs 'on the question of the jurisdiction of this Commission to issue both an annual license and a new license in Project No. 108 without the consent of the Lac Courte Oreilles Band.'[15] After this briefing was completed the Commission, on August 6, 1973, issued the third annual license to Northern States, conditioning the grant on the fact that should the Commission decide, based on the previously submitted briefs, that it did not have jurisdiction to issue such an annual license, the license would terminate as of the date of the Commission's opinion. On August 31, 1973 the Band applied for a rehearing with respect to issuance of that license, and on September 5, 1973 a similar application was filed by several intervenors.[16] These petitions repeated the substance of the claims made by the Band in the recapture-relicensing proceedings.
 
 
 5
 On September 14, 1973 the Commission issued Opinion No. 664, the subject of this appeal. In concluding that opinion, the Commission declared:
 
 
 6
 (A) In exercising the authority conferred upon it by section 15 of the Federal Power Act, the Commission may grant a new license or an annual license for Project No. 108, notwithstanding the unwillingness of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians to consent to the use by the licensee of tribal lands underlying such project.
 
 
 7
 (B) The petition and application for rehearing, filed herein on September 1, 1972, and the applications for rehearing filed on August 31, 1973, and September 5, 1973, are denied.[17]
 
 
 8
 However, the Commission explicitly stated that its opinion was not to be construed as indicating any predisposition on the issues of recapture and relicensing, or as a finding under Section 4(e) of the Federal Power Act that a new license could issue consistent with the purposes for which the reservation was established;[18] these issues are the subject of administrative hearings which, as already noted, are still pending.
 
 
 9
 Commissioner Moody nevertheless dissented, stating:
 
 
 10
 (W)e cannot, as a matter of law make the essential finding required by 4(e). By treaty and by statute, the Lac Courte Oreilles Band has been given sovereignty over tribal lands; this was, and continues to be, the 'purpose for which such reservation was created.' With the Band's unequivocal rejection of use of tribal lands by Northern States or any Commission licensee for power purposes, we have no lawful basis for the issuance of a license.[19]
 
 II
 
 11
 Section 15(a) of the Federal Power Act, 16 U.S.C. § 808(a) (1970), provides:
 
 
 12
 If the United States does not, at the expiration of the original license, exercise its right to take over, maintain, and operate any project or projects of the licensee, as provided in section 807 of this title,[20] the commission is authorized to issue a new license to the original licensee upon such terms and conditions as may be authorized or required under the then existing laws and regulations, or to issue a new license under said terms and conditions to a new licensee, which license may cover any project or projects covered by the original license, and shall be issued on the condition that the new licensee shall, before taking possession of such project or projects, pay such amount, and assume such contracts as the United States is required to do in the manner specified in section 807 of this title: Provided, That in the event the United States does not exercise the right to take over or does not issue a license to a new licensee, or issue a new license to the original licensee, upon reasonable terms, then the commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the original license until the property is taken over or a new license is issued as aforesaid.
 
 
 13
 (Emphasis added.) Defending its grant of annual licenses to Northern States under this provision, the Commission asserted:
 
 
 14
 In this proceeding, the conditions are met: the United States had not exercised its right to take over, and a new license has not been granted. The operative word is 'shall'. We had no option not to issue annual licenses in August 1971, 1972, and 1973 to the Northern States Power Company. * * *[21]
 
 
 15
 In essence, petitioners argue that this literal interpretation of Section 15, which accords the FPC a purely ministerial and nondiscretionary function in the issuance of interim annual licenses, leads to incongruous results. Reasoning from the premise that the Treaty of 1854 and Section 16 of the Indian Reorganization Act do in fact accord the Band a veto power over undersired Commission licensing of its tribal lands, petitioners contend that this power would be vitiated unless Section 15 were interpreted to require annual licenses only when the Commission has jurisdiction to grant a new license under Section 4(e) of the Federal Power Act.[22] This contention is supported by the hypothetical of a perpetual license: if the Band vetoes a proposed Section 4(e) license utilizing its lands, a literal interpretation of Section 15(a) would require annual licenses to issue until either congressional recapture of the project or other disposition under Commission order. But if Congress does not desire to recapture the project, the annual licenses would issue indefinitely, yielding a result which, under the hypothesis of a tribal veto of a long-term license, could not be directly achieved by the Commission. This result would therefore frustrate the presumed powers conferred on the Band by the Treaty of 1854 and the Indian Reorganization Act.[23] Thus the Band contends that if it in fact possesses the power to veto any relicensing of the project, it necessarily follows that, in order to avoid the incongruity of indefinite annual licensing, it must also have the power to veto any interim annual license for the project.[24] As Commissioner Moody stated in accepting the Band's contentions in his dissent to Opinion No. 664, 'the annual licensing provisions of Section 15(a) must be read as authorizing annual licenses only in those instances where the Commission is empowered to act on a relicense application.'[25]
 
 
 16
 Assuming arguendo that the Commission erred in holding that it has the legal authority to issue a new license for Project No. 108 encompassing Indian tribal lands despite objections of the tribe with sovereignty over those lands, we agree with the Commission that Section 15(a) mandates the grant of annual licenses under the circumstances of this case. Not only the plain language of the statute, but also the legislative history of and the policies served by Section 15(a) support this result. However, since we believe the Band would be in error in its suggested interpretation of Section 15(a) even if it were correct in its claim to possess a veto power over issuance of long-term licenses, we feel constrained to amplify somewhat on the Commission's relatively opaque reasoning.
 
 
 17
 The basic fallacy of the Band's interpretation of Section 15(a) lies in its assumption that 'the Commission's authority to issue annual licenses derives from its concurrent consideration of a perfected application for a new license, and not from the expiring or expired license.'[26] Congress fashioned Section 15 to prevent abrupt termination of a power project which should, in the public interest, be continued, but with respect to which the identity of the operator and the exact method of operation must be reevaluated.[27] Admittedly, one possible disposition by the Commission at the expiration of a license would be issuance of a new license to a new applicant or to the original licensee. However, another possible disposition would entail a congressional decision to recapture the project. Indeed, Section 15(a) specifies that the Commission only has authority to issue a new long term license if Congress fails to exercise its recapture option.[28] Section 15(a) annual licenses are designed to prevent a possible hiatus in the operation of a project while either of these decisions is being made, preserving the status quo at the expiration of a long-term license and thereby guaranteeing that 'industries created by (Commission projects) and dependent upon them may not suffer.'[29] The Band does not contend that Congress is without power to abrogate prior treaties or statutes concerning Indian tribal lands, so long as Congress acts with sufficiently specific intent and complies with constitutional requirements of due process and just compensation.[30] And the Band accepts the fact that congressional action on recapture of Project No. 108 would constitute such a specific action respecting the relevant tribal lands.[31] What the Band apparently fails to appreciate, however, is that by requiring issuance of annual licenses pending such congressional action, Section 15 affords the Commission and Congress time to make a reasoned decision concerning the desirability of federal takeover of a project, at the same time preserving the status quo while that decision is being made.
 
 
 18
 That Congress intended Section 15 to preserve its option of making a careful, deliberate judgment concerning disposition of a project at the expiration of an initial license term is evident in the legislative history of the 1968 amendments to the Federal Power Act, by which Congress established efficient, consolidated recapture-relicensing procedures.[32] Congress specifically indicated
 
 
 19
 that if, after notice and opportunity for hearing, the Commission determines that the United States should take over any project or projects for public purposes, the Commission shall not issue a new license but shall submit its recommendation to Congress, together with such information as it considers appropriate. Until the Congress acts there would be an annual renewal of the expired license as provided under existing law.[33]
 
 
 20
 Moreover, Congress had been made aware by the Commission that one of the fundamental choices upon license termination occurs when the licensee wants to abandon a project (and presumably fails to apply for a new license), but the public interest dictates that it be maintained in whole or in part for nonpower purposes.[34] Admittedly, this could be effectuated by grant of a nonpower license to a new applicant,[35] but it could also be done, in the absence of any application for a license for either power or nonpower use, through federal recapture of the project. And as indicated above, annual licenses were to issue until that congressional decision was made. It would indeed be anomalous if Section 15, which is plain on its face, were arbitrarily construed to deny Congress an opportunity to guarantee the continued operation of a project which the Government believes should be maintained in the public interest, but which no private concern believes would be feasible to operate and for which no new license applications are submitted at the expiration of an initial license period. And the situation is absolutely analogous when the Commission lacks authority to issue a new license, but considers the project so important for the public good that Congress should be presented with the opportunity to either take over operation of the project or otherwise institute proceedings that would ensure continued private operation.[36] Section 15 is the vehicle by which Congress reserved the option of taking such action on a project without detrimentally affecting the status quo during its deliberations.[37]
 
 
 21
 Thus, even if we were to hold that the Indian Reorganization Act and the Treaty of 1854 conferred a veto power upon the Lac Courte Oreilles Band of Lake Superior Chippewa Indians with respect to grant of a new license or relicensing of Northern States, we would have to hold that the recapture-relicensing proceedings now pending before the Commission could continue, although limited to the issue of federal recapture. And pending a final determination of that issue, Section 15 embodies the congressional intent that licenses must issue to Northern States. Whatever the rights of a tribe to prevent an initial licensing of a project, once such a license has been issued Section 15 renders those rights subordinate to the congressional right to determine the most efficient and desirable disposition of that project upon the termination of that license.[38]
 
 
 22
 Nor need we worry about the possibility that Congress will in the end decide against federal recapture. Section 15 was fashioned to afford Congress the opportunity to make such a determination; its operative effect cannot be conditioned on speculation as to how Congress will utilize that opportunity. As long as Congress and the Commission are proceeding with due diligence in making a recapture determination (even under the hypothesis that relicensing is precluded due to lack of tribal consent), it is reasonable to interpret the language of the statute to dictate what its language plainly requires--'the commission shall issue from year to year an annual license to the then licensee under the terms and conditions of the original license until the property is taken over or a new license is issued.' (Emphasis added.) Indeed, we see no escape from holding that under the circumstances of this case, Northern States not only had the right, but also the obligation, to operate Project No. 108 under interim annual licenses. Considering the purposes served by Section 15, this result is as wise as a matter of policy as it is necessary as a matter of law.
 
 
 23
 The propriety of this interpretation is underscored by the circumstances of the case before us. As indicated above, the Commission is gathering data and opinions on which to base its recapture recommendations for Project No. 108 in a consolidated recapture-relicensing proceeding, a mandated by the 1968 amendments to the Federal Power Act. Federal recapture of the project has been strenuously urged at those hearings by the Departments of Agriculture and the Interior; the Band, while continuously expressing its disapproval of any relicensing of its tribal lands that would permit operation of the storage reservoir as part of a power-generating system, has acquiesced in their proposal for recapture, under which the Government would operate the reservoir in a more environmentally acceptable manner.[39] But if annual licenses cannot lawfully issue pending resolution of the recapture issue, the option of maintaining a reservoir under any circumstances may be lost. For although only 525 of the 29,000 acres within the project are situated on Indian tribal lands, a portion of those tribal lands is so located that restoration of the lands to the tribe would require that the dam be removed and the whole reservoir drained.[40] Moreover, the parties stipulated in oral argument that although the record in the recapture-relicensing proceeding had been closed, the Band and the Departments of Agriculture and the Interior had moved to reopen it for the purpose of introducing further evidence supporting recapture; this motion was opposed by Northern States, which was willing to have the recapture-relicensing decision made as expeditiously as possible. It is thus clear that the Commission is diligently attempting to make a recapture-relicensing determination, and that delay in reaching an ultimate resolution of that question is in fact attributable to closer examination of the recapture option which the Band wants Congress to exercise.40A
 
 
 24
 We of course recognize the merits of the Band's contention that the literal language of Section 15 could produce absurd results in the hypothetical 'perpetual license' situation.[41] But as the Commission noted:
 
 
 25
 We will not address ourselves to the hypothetical question of a perpetual franchise. We instead observe that annual licenses for Project No. 108 will cease when this proceeding is completed.[42]
 
 
 26
 We are confident that the Commission intended by this statement to indicate that if recapture were not effectuated and it could not make the Section 4(e) finding requisite for issuance of a new long-term license, it would not regard Section 15 as mandating indefinite annual licensing. Such an interpretation is, we believe, necessary to a coherent and reasonable interpretation of Section 15.[43] But short of that eventuality, Section 15 requires interim annual licenses. For as our previous discussion should make clear, Section 15 contemplates annual licenses to preserve either the alternative of issuing a new license or that of federal recapture. Even if the alternative of a new license is obviated, whether because no applications for a long-term license are filed or because the Commission lacks authority for any reason to issue a new license, Section 15 does not lead to absurd results since it preserves the congressional option to act. However, if Congress decides against federal recapture, then continued operation of Section 15 would indeed serve no rational purpose if a new license cannot issue. Under the circumstances of the case sub judice, this would mean that if Congress does not recapture the project,[44] the Band could litigate its contention that the Indian Reorganization Act and relevant treaty provisions vest it with a veto power which deprives the Commission of all authority to issue any licenses over its failure to assent.
 
 III
 
 27
 As should be evident from our discussion of the validity of the annual licenses which have been issued to Northern States, our decision in no way turns upon the Commission's authority vel non to issue a long term license for Project No. 108 over the objections of the tribe with sovereignty over the affected lands. Moreover, the Commission may recommend federal recapture of the project or may be unable, for a variety of reasons, to make the Section 4(e) determination that a new license 'will not interfere or be inconsistent with'[45] the purpose for which the Lac Courte Oreilles Band of Lake Superior Chippewa Indians' reservation was established. Either of these results would moot the controversy and avoid the necessity of our passing on the question of the Commission's power to effectively ignore the Band's objections to the long-term licensing of its tribal lands for power generating purposes. Thus, since interim annual licenses must issue in any event while the recapture-relicensing hearings proceed, the Commission's ruling does not now have an immediate and significant impact upon petitioners. Moreover, our review of the authority of the Commission to license Northern States over the Band's lack of assent may be further informed by developments in those recapture-relicensing proceedings now being conducted by the Commission, should the Commission issue a new license and thereby render review necessary and appropriate. We hold that, in this posture, the determination of the Commission is not ripe for review.[46] Although we therefore decline to vacate Opinion No. 664 or to decide the basic question addressed therein, we nevertheless believe that in our role as a reviewing court we have an obligation to point out a plain error in the opinion which, if not corrected, might cause unnecessary delay and waste of Commission and judicial resources in any later review proceedings.
 
 
 28
 Having determined that the affected tribal lands were part of a 'reservation' within the meaning of the Federal Power Act,[47] the Commission observed:
 
 
 29
 The issue, as we see it, is whether we are dealing with a 'reservation' for purposes of the Power Acts, not what kind of rights or interests the pertinent Indians have in that reservation. * * * Congress, by enacting the Federal Water Power Act of 1920, abrogated the 1854 Treaty (with the Chippewas) to the extent necessary to permit construction of hydroelectric projects on the lands reserved to the Band.
 
 
 30
 Two provisions of the 1920 Act, contained in sections 4(d) and 10(e), make plain the Congress' intent to authorize the Federal Power Commission to exercise its responsibilities with respect to land on Indian reservations. Section 4(d) authorized the Commission to issue licenses for hydroelectric projects 'along, from or in any of the navigable waters of the United States, or upon any part of the public lands and reservations of the United States'; and the section further provided
 
 
 31
 That licenses shall be issued within any reservation only after a finding by the commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation . . . (41 Stat. 1065).
 
 
 32
 Section 10(e) of the 1920 Act provided for the payment by the licensee to the United States of reasonable annual charges, with the proviso
 
 
 33
 That when licenses are issued involving the use of Government dams or other structures owned by the United States or tribal lands embraced within Indian reservations the commission shall fix a reasonable annual charge for the use thereof . . . (41 Stat. 1069).
 
 
 34
 In our judgment, these explicit references in the 1920 Act to the licensing of projects on Indian reservations make clear the Congress' purpose to abrogate such a treaty as that of September 30, 1854, if necessary and to the extent necessary to permit the licensing by the Federal Power Commission of projects on Indian reserved land. We thus hold that the rights of the Lac Courte Oreilles Band under the 1854 Treaty were diminished by the Congress to the extent necessary to permit the Commission to exercise the licensing authority conferred upon it by the Federal Water Power Act of 1920.
 
 
 35
 (W)e reach that conclusion in light of the plain statutory language. That is, the land made available for the 'use' of the Band under the 1854 Treaty was, subsequently, also made subject to the authority of this Commission, this as shown by section (sic) 3, 4(d), and 10(e) of the 1920 Act and corresponding sections of the 1935 Act; and if the Treaty and the statutes are in conflict, the later in time prevails.[48]
 
 
 36
 The logic behind this reasoning escapes us. There is no doubt that the 1920 Act, as the Commission argues and the quoted provisions indicate, gave the Commission authority to issue licenses affecting Indian tribal lands. Yet it is also plain that the Act conditioned the Commission's authority to grant such licenses on its ability to find 'that the license will not interfere or be inconsistent with the purpose for which such reservation was created.' This determination can obviously only be made by ascertaining the rights conferred upon the Band by the treaties establishing the reservation. Indeed, if those rights are automatically abrogated to the extent necessary to allow every license the Commission wishes to issue, it is difficult to see why the Commission need make any determination under Section 4(e) in the pending recapture-relicensing proceedings. Yet the Commission, in Opinion No. 664, inconsistently stated that such a determination would still be required.[49]
 
 
 37
 We intimate no views as to what rights the relevant treaties confer upon the Band, or what light Section 16 of the Indian Reorganization Act[50] and the later 1935 amendments to Section 10(e) of the Federal Water Power Act[51] shed upon the existence or scope of those rights. These are issues which need not now be reached, and which we leave to the Commission to ascertain before it decides to issue any new license for Project No. 108. We merely wish to indicate to the Commission that those rights must be assessed, as required by Section 4(e), as a precondition to issuance of any long-term license affecting the Band's tribal lands.
 
 
 38
 The issuance to Northern States of interim annual licenses is affirmed, and the question of whether the Section 4(e) determination can be made despite the Band's failure to assent to any further long-term licenses covering its tribal lands is left to the Commission for further consideration in the pending recapture-relicensing proceedings.
 
 
 39
 So ordered.
 
 
 40
 MacKINNON, Circuit Judge (concurring and dissenting):
 
 
 41
 I concur generally in the forepart of this opinion but in my view the expressions of opinion as to section 4(e) are unnecessary to our disposition of the principal issue, i.e., the annual renewals. Accordingly, I do not join in the comments with respect to section 4(e) that might be considered as holdings. This has particular reference to the comments beginning at the end of the first paragraph of Part III on page 210 and continuing thereafter to the end of the opinion and to footnote 22.
 
 
 42
 If section 4(e) is given an overly literal interpretation it would prevent the use of any lands in a 'reservation' (including tribal lands) in a power project, if as Commissioner Moody's dissent states, the purpose for which the reservation was created was to 'give sovereignty over tribal lands.' That might be stated to be the broad purpose behind the creation of every Indian reservation. Thus, no reservation lands could ever be used in power projects. Such interpretation, however, would be internally inconsistent with the remainder of the 4(e) proviso,[1] and a number of other provisions in the Act, and the legislative history thereof, which definitely contemplate and provide for incorporating such reservation lands into federal power projects on proper terms. Probably, the congressional intent of 4(e) was to prohibit any use of land within a reservation that would substantially interfere with the purpose for which such reservation was created or acquired. But I would not express any final opinion on this phase of the case.
 
 
 43
 The majority opinion asserts that the Commission stated that a 'determination (under 4(e)) would still be required.' Opinion, supra, 166 U.S.App.D.C. at ---, 510 F.2d at 212 and note 49. What the Commission did say in its opinion was that it was 'not now, in this order, undertaking to make any statutory finding that may be required under section 4(e) of the 1935 Act.' App. 55. The Commission thus left the matter open.
 
 
 
 [1]
 Northern States Power Co., Project No. 108, Opinion and Order Concerning Commission Authority to Issue New License or Annual License for Hydroelectric Project on Certain Indian Tribal Lands, 50 FPC 753 (1973) (Nassikas, Chairman) (3--1 decision)
 
 
 [2]
 16 U.S.C. § 808(a) (1970), quoted infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 203--204
 
 
 [3]
 See infra, 166 U.S.App.D.C. at --- - ---, --- - ---, 510 F.2d at 200--203, 208--209
 C Project No. 108 is a reservoir and dam across the Chippewa River in Wisconsin consisting of approximately 29,000 acres, 525 of which are situated on tribal lands of the Band.[4] Although the project itself produces no power, it is operated as a storage reservoir to regulate the flow of the Chippewa River for seven downstream hydroelectric plants. As part of a comprehensive system of headwater improvements on the Chippewa and Wisconsin Rivers and their tributaries, Project No. 108 was constructed pursuant to a 50-year license issued by the FPC on August 8, 1921 to the predecessor of intervenor Northern States, the current licensee.
 
 
 [4]
 The reservoir itself covers about 17,600 acres, constituting the third largest lake in Wisconsin. Of the 29,000 acres in the project, 7,761 were lands reserved for the habitat of the Band by the Treaty of September 30, 1854, 10 Stat. 1109. Much of this land had been subsequently placed in the hands of individual Indians through an allotment program conducted pursuant to Article 3 of the Treaty, and those Indians could dispose of the land as they saw fit. Moreover, in 1901 Congress enacted a law permitting condemnation of allotted fee lands in the same manner as lands owned in fee by non-Indians. 25 U.S.C. § 357 (1970). Through purchase and condemnation, Northern States acquired title to about 5,500 acres out of this total, and easements over an additional 1,745 acres. The remaining 525 acres of tribal land are the subject of the order sub judice
 It should be noted that when the original license for Project No. 108 was issued, only 315 acres of tribal land were to be affected, but after the reservoir was filled 'it was determined' that 525.5 acres had been flooded (including inundation of one of the villages on the reservation), and the license was amended accordingly. See Opinion No. 664, 50 FPC at 756--758; brief for respondent FPC at 6; brief of petitioner American Indian Movement National Directors, Inc. (hereinafter AIM) at 1--2. Pursuant to § 10(e) of the Federal Power Act, 16 U.S.C. § 803(e) (1970), see note 38 infra, an annual charge, payable to the Government for use by the tribe, was fixed at $1,389.09 for the licensed lands.
 
 
 [5]
 Section 14 of the Federal Power Act, 16 U.S.C. § 807 (1970), provides in pertinent part:
 (a) Compensation; condemnation by Federal or State Government.
 Upon not less than two years' notice in writing from the Commission the United State shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project * * * upon the condition that before taking possession it shall pay the net investment of the licensee in the project * * *. * * *
 (b) Time of applications for new licenses; relicensing proceedings; Federal agency recommendations of take over by Government; stay of orders for new licenses; termination of stay; notice to Congress.
 No earlier than five years before the expiration of any license, the Commission shall entertain applications for a new license and decide them in a relicensing proceeding pursuant to the provisions of section 808 of this title (see infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 203--204). In any relicensing proceeding before the Commission any Federal department or agency may timely recommend, pursuant to such rules as the Commission shall prescribe, that the United States exercise its right to take over any project or projects. Thereafter, the Commission, if it does not itself recommend such action pursuant to the provisions of section 800(c) of this title (see note 7 infra), shall upon motion of such department or agency stay the effective date of any order issuing a license, except an order issuing an annual license in accordance with the proviso of section 808(a) of this title, for two years after the date of issuance of such order, after which period the stay shall terminate, unless terminated earlier upon motion of the department or agency requesting the stay or by action of Congress. The Commission shall notify the Congress of any stay granted pursuant to this subsection.
 
 
 [6]
 Intervenors included the Band, Save the Chippewa Flowage Alliance, Inc., Wisconsin Resources Conservation Council, and petitioners Great Lakes Inter-Tribal Council, Inc. and American Indian Movement National Directors, Inc
 
 
 [7]
 Until 1968, about two years before a license was to expire the Commission would prepare a report, based on preliminary investigations, as to whether federal recapture at the expiration date was desirable. The report and attendant recommendations would be sent to Congress and, if Congress took no action before the license expiration date, the Commission would consider that it could proceed with relicensing unless the relicensing hearing developed new information which would warrant a further evaluation of the recapture question. See generally H.R.Rep.No.1643, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News, 1968, p. 3081 (House report on bill whose language was substituted for Senate bill, which was passed by both Houses)
 In 1968 Congress amended the Federal Power Act to alter this practice. Section 14(b) of the Act, 16 U.S.C. § 807(b) (1970), now provides that the Commission consider recapture and relicensing in a single proceeding. See note 5 supra. See generally H.R.Rep.No.1643, supra. If the Commission determines that the United States should exercise its right to take over the project, 'the Commission shall not issue a new license to the original licensee or a new licensee but shall submit its recommendation to Congress' for its consideration. Federal Power Act § 7(c), 16 U.S.C. § 800(c) (1970). 'Until the Congress acts, there would be an annual renewal of the expired license.' See H.R.Rep.No.1643, supra, at 5, U.S.Code Cong. & Admin.News 1968, p. 3084. If the Commission determines that recapture is not desirable and that a new license should issue, it can proceed without referring the matter to Congress. Any interested Government department or agency may, however, recommend recapture and move to stay for two years the effectiveness of any order issuing a new license, thereby according Congress an opportunity to consider the recapture-relicensing issue. Federal Power Act § 14(b), 16 U.S.C. § 807(b) (1970); see note 5 supra.
 
 
 [8]
 See, e.g., Petition to Intervene, Motion for Regional Hearing, and Motion for Limitation of Issues (Oct. 4, 1971), reprinted in Joint Appendix (JA) at 1--9
 
 
 [9]
 See, e.g., Opinion No. 664, 50 FPC at 755--756, 758--759; Tribal Resolution No. 73--54, reprinted in brief for AIM at 30--31; Tribal Resolution No. 73--55, reprinted in JA at 49
 There is a 17-foot average fluctuation in the water level of the reservoir under current operating conditions. The Band asserts that rice growth is impossible under these conditions, which have allegedly had an adverse effect on the environment. Under the recapture proposal supported by the Band, the water level would be stabilized and the lake maintained, although not for power production purposes; with a proposed 2-foot average water fluctuation, the growth of wild rice would again be possible. Moreover, the recapture proposal contemplates a return to the Band of the 5,500 acres of allotted Indian lands which had been acquired by Northern States through purchase or condemnation. See note 4, supra.
 
 
 [10]
 Under § 16 of the Indian Reorganization Act, 25 U.S.C. § 476 (1970), a tribe organized under the Act may adopt a constitution which would
 vest in such tribe or its tribal council * * * (the right) to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe * * *.
 In 1966 the Band organized under the Act, and its constitution and bylaws were approved by the Secretary of the Interior on Nov. 2, 1966. The § 16 power to prevent disposition or encumbrance of tribal land was specifically incorporated in Article V, § 1(b) of the tribal constitution and bylaws.
 
 
 [11]
 Section 4(e) of the Federal Power Act, 16 U.S.C. § 797(e) (1970), authorizes the Commission:
 To issue licenses * * * for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, * * * or other project works necessary or convenient for the * * * development, transmission, and utilization of power * * * upon any part of the public lands and reservations of the United States * * * except as herein provided: Provided, That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations(.)
 (Emphasis added.) Section 3(2) of the Federal Power Act, 16 U.S.C. § 796(2) (1970), defines 'reservations' to include 'tribal lands embraced within Indian reservations.'
 
 
 [12]
 Order Providing for Hearing, Prescribing Procedure, and Ruling on Motions (June 28, 1972), reprinted in JA at 11--17
 
 
 [13]
 See infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 203--204
 
 
 [14]
 See Petition and Application for Rehearing, reprinted in JA at 18--23. The Band was supported in its petition and application for rehearing by the other four intervenors, see note 6 supra, to the main recapture-relicensing proceeding
 
 
 [15]
 Order Providing for the Submission of Briefs at 3 (Feb. 28, 1973), reprinted in JA at 46
 
 
 [16]
 Those intervening were the organizations listed at note 6 supra, as well as the Northern Environmental Council, Inc
 
 
 [17]
 50 FPC at 776
 
 
 [18]
 Id. at 756. Although the Commission at one point in its opinion indicated that 'we are not now, in this order, undertaking to make any statutory finding that may be required of us under Section 4(e) of the 1935 Act,' id. at 767 (emphasis added), the conditional was intended only as a recognition that if Congress decided to recapture the project, § 4(e) findings would obviously not have to be made. However, the Commission realized that if there was no federal recapture it would have to 'make the necessary findings under Section 4(e) to support a(ny) further license.' Id. at 770
 
 
 [19]
 50 FPC at 777
 
 
 [20]
 See note 5 supra
 
 
 [21]
 50 FPC at 773. The Commission also quoted § 9(b) of the Administrative Procedure Act (APA), 5 U.S.C. § 558 (1970), as an alternative statutory basis for its purported duty to issue annual licenses to Northern States. That section provides in part:
 When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.
 The House Report on the 1968 amendments to the Federal Power Act, which altered the recapture-relicensing procedure, see note 5 supra, stated:
 Just as in the case of original licensing the controlling criteria (in the recapture-relicensing proceeding) would be the comprehensive development standard of section 10(a) of the Federal Power Act. In view of this fact the relicensing proceeding would be deemed to involve 'initial licensing' within the context of the Administrative Procedure Act rather than 'license renewal'.
 H.R.Rep.No.1643, supra note 7, at 5, U.S.Code Cong. & Admin.News 1968, p. 3084. We doubt, however, that this statement was intended to have any effect on the APA interim license provisions, since that section requires continuation of a prior license even when a licensee has made a timely and sufficient application for a new license. Rather, the Report appeared to be directed at the substantive standard for issuing a new license; it was to be awarded to the applicant which would provide the optimum development and accommodation (where a conflict arises) in terms of resource values, and not reissued on a pro forma basis to the old licensee. See generally id. at 5, 9--10.
 In any event, on the view of the case we develop in text the APA issue need not be reached, particularly since it would accord Northern States fewer rights than would § 15(a) with respect to Project No. 108. If § 9 of the APA were the only relevant provision, the Band would be on solid ground in arguing that the Commission must have authority to issue a new license before Northern States could continue operations after the nominal license termination date, since that section requires that there be a 'timely and sufficient' application for a new license or license renewal (emphasis added). However, we do not reach that issue in our decision today, since we hold that even if the Commission could not issue a new license over the objections of the Band, § 15(a) of the Federal Power Act mandates that annual licenses issue until Congress has had an opportunity to evaluate whether it desires to exercise its option of recapturing the project. See generally infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 205--210.
 
 
 [22]
 Northern States suggests that § 4(e) of the Federal Power Act, see note 11 supra, applies only to 'the issuance of original licenses * * * (and) is not applicable to a relicensing proceeding under section 15 of the Act.' Brief for Northern States Power Company at 7 n.1. Although we agree that § 15 governs issuance of interim annual licenses pending a recapture-relicensing determination, it is clear that any new license, whether issued to the original licensee or to a new applicant, must be issued according to, inter alia, the standards of Federal Power Act § 10, 16 U.S.C. § 803 (1970) (stating that 'all licenses issued under this subchapter shall be on the following (prescribed) conditions') (emphasis added), see note 21 supra, and Federal Power Act § 4(e), 16 U.S.C. § 797(e) (1970) (empowering the Commission to issue licenses, but specifying that such licenses may only issue if the Commission can make certain specified findings), see, e.g., Opinion No. 664, 50 FPC at 756, 767, 770; notes 11, 18 supra; cf. FPC v. Tuscarora Indian Nation, 362 U.S. 99, 110--111, 115, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960)
 
 
 [23]
 It would also allegedly frustrate the § 4(e) requirement that licenses can only issue when they would 'not interfere or be inconsistent with' the purpose for which the reservation was created. See note 11 supra
 
 
 [24]
 See generally brief of the Band at 34--39. See also brief of AIM at 33--35
 
 
 [25]
 50 FPC at 776 n.1
 
 
 [26]
 Brief of the Band at 35. See also brief of AIM at 34. The AIM brief also states that if 'a complete application for a new license is not submitted, the Commission does not have jurisdiction to issue annual licenses to an undeserving licensee,' implying that the failure to submit an application for a new license renders an old licensee 'undeserving' of annual licenses. To the contrary, an old licensee has an obligation to continue operation of a project under annual licenses pending Commission disposition, whether he desires to or not. Indeed, this is the case even if the licensee submits an application but the Commission considers that the project would be better run by the Government. See infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 206--207
 
 
 [27]
 At the expiration of a license, the Commission must decide who can best run the project, see note 21 supra, and may alter the conditions under which the project is to be operated, see supra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 203--204
 
 
 [28]
 Section 15 begins by stating, 'If the United States does not * * * (exercise its right to recapture the project), the commission is authorized' to issue a new license. See supra, 166 U.S.App.D.C. at ---, 510 F.2d at 203. See also H.R.Rep.No.1643, supra, note 7, at 3
 
 
 [29]
 S.Rep.No.180, 66th Cong., 1st Sess., 2 (1919) (legislative history of Federal Water Power Act, which first included § 15 and which became the Federal Power Act of 1935)
 
 
 [30]
 Brief of the Band at 11--17; see, e.g., Menominee Tribe of Indians v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); Lone Wolf v. Hitchcock, 187 U.S. 553, 566, 23 S.Ct. 216, 47 L.Ed. 299 (1903); Bennett County, South Dakota v. United States, 8 Cir., 394 F.2d 8, 11--12 (1968), and cases cited therein. See also note 38 infra
 
 
 [31]
 See, e.g., brief of the Band at 25--26 (when Indians object to license issuance 'Congress, and not the Commission, is the final arbiter')
 
 
 [32]
 See note 7 supra
 
 
 [33]
 H.R.Rep.No.1643, supra note 7, at 5, U.S.Code Cong. & Admin.News 1968, p. 3084 (emphasis added); see note 7 supra. See also S.Rep.No.1319, 90th Cong., 2d Sess., 6 (1968). Moreover, although Congress accorded interested agencies the power to require the Commission to stay issuance of new licenses, it explicitly excluded interim annual licenses from this power. See note 5 supra
 The legislative history of the original § 15, which first appeared in the conference report to the Federal Power Act of 1920, see H.R.Rep.No.1147, 65th Cong., 3d Sess., 9 (1919), is rather scant. However, in explaining the conference report, the Chairman of the Special Water Committee of the House stated that the annual license provisions were requested by the Senate conferees, who 'were very insistent upon not having a possible hiatus' in the operation of a project until Congress had acted or a new license had been granted. 57 Cong.Rec. 4637 (1919) (remarks of Rep. Sims). See also S.Rep.No.180, supra note 29, at 2 ('The works must be continued in operation at the end of 50 years in order that the industries created by them may not suffer.').
 
 
 [34]
 See, e.g., H.R.Rep.No.1643, supra note 7, at 9 (letter to Speaker of the House from Chairman of Federal Power Commission)
 
 
 [35]
 Congress explicitly provided the Commission the power to accomplish this by enacting § 15(b) of the Federal Power Act in 1968. See 16 U.S.C. § 808(b) (1970). Such licenses were, however, to be temporary, to be terminable as soon as any state, municipality, interstate agency, or federal agency other than the Commission which is authorized and willing to take over regulatory responsibility does so. See id
 
 
 [36]
 Congress could, if it wished, pass special legislation or institute eminent domain proceedings that would place operation of a project in private hands for operation for the public good, since the Fifth Amendment's 'public use' language refers to the purpose for which something is employed, not to the identity of the operator. See generally Nichols', Eminent Domain §§ 3.21(2), 7.5--7.51 (rey. 3d ed., J. Sackman ed. 1974)
 
 
 [37]
 It is no response to say that Congress should make these decisions before expiration of the initial license term. The inclusion of § 15(a) in the Act and the provisions by which Congress specified consolidated recapture-relicensing proceedings indicate that Congress clearly contemplated that the hearings held by the Commission concerning these issues would take time, and would in all likelihood continue after the nominal license expiration date. Moreover, even if the Band did have a veto power over issuance of new longterm licenses, it is evident that Congress would have to make its determinations after the license expiration date if the Indians merely withheld any indication of their intention to exercise any such veto until at or very near the time the initial license was set to expire; in such a situation, the need for an early congressional recapture-relicensing determination could not be anticipated and accounted for by prior congressional action. Thus we believe Commission and congressional action is proper even significantly after the license expiration date, and interim licenses should issue so long as the Commission is proceeding in good faith with the hearings necessary to make a proper disposition of the project. See also infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 207--209
 
 
 [38]
 This result does not entail in a taking without just compensation under the Fifth Amendment. Section 10(e) of the Federal Power Act, 16 U.S.C. § 803(e) (1970), requires the licensee to pay a reasonable annual charge to the United States 'recompensing it for the use, occupancy, and enjoyment of its lands,' and § 17 of the Federal Power Act, 16 U.S.C. § 810 (1970), provides that '(a)ll proceeds from any Indian reservation shall be placed to the credit of the Indians of such reservation.' This compensation would continue during the interim annual licensing, since § 15(a) renders those interim licenses subject to 'the terms and conditions of the original license.' Moreover, for long-term licenses issued after 1935, § 10(e) subjects fixing of the reasonable annual license charges 'to the approval of the Indian tribe having jurisdiction' over the affected tribal lands
 
 
 [39]
 See note 9 supra. Tribal consent is of course not a prerequisite to congressional action. See supra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 206, notes 30 & 31. Nevertheless, the Band does appear to desire federal recapture under the proposals submitted by the Department of Agriculture and the Interior. Indeed, the Band did not seek an abortion of the pending Commission proceedings, which might transpire if annual licenses cannot lawfully issue. Rather, it merely sought to limit them to the issue of federal recapture. See supra, 166 U.S.App.D.C. at ---, 510 F.2d at 202
 
 
 [40]
 Section 23(b) of the Federal Power Act, 16 U.S.C. § 817 (1970), would render it unlawful for Northern States to operate Project No. 108 in such a manner that tribal lands were inundated unless the company had a valid license from the Commission covering the affected lands
 40A The Commission has since granted the Departments' joint petition to reopen the record so that a Land Use and Resource Management Plan could be introduced into evidence. See Order Reopening the Proceeding (FPC, issued Feb. 14, 1975). However, to avoid 'an indefinite delay,' the Commission ordered that the Plan be filed not later than eight months from the date of the order, the shortest interval within which the Departments could prepare the Plan. Id. at 6.
 
 
 [41]
 The Band suggests that the Commission's interpretation of the statute would require the issuance of indefinite annual licenses in a situation in which no one seeks a new license and the Government does not believe federal recapture is appropriate, as well as in the See brief of the Band at 38. However, U.S.App.D.C. at --- - ---, 510 F.2d at 204--205. See brief of the Board at 38. However, as we indicate below in text, an interpretation of § 15(a) which says that interim annual licenses must issue when one of the possible dispositions (whether relicensing or recapture) cannot occur, but the other is still possible and is still being actively considered, does not mean that § 15(a) must be similarly interpreted when neither possible disposition can occur, and neither is still being considered. In any event, even if annual licenses were required in the situation posed by the Band, the Commission and the licensee could achieve their mutual desire to terminate operation of the project through the voluntary surrender provisions of § 6 of the Federal Power Act, 16 U.S.C. § 799 (1970)
 
 
 [42]
 50 FPC at 773
 
 
 [43]
 It is well established, as the Band claims, that there is a judicial presumption against imputing to Congress an intent to produce an absurd, clearly unintended result. See, e.g., Red River Broadcasting Co. v. FCC, 69 App.D.C. 1, 5--6, 98 F.2d 282, 286--287, cert. denied, 305 U.S. 625, 59 S.Ct. 86, 83 L.Ed. 400 (1938). Our disagreement with the Band stems from the fact that, although we believe there are situations in which a strict interpretation of § 15(a) could produce such a result, we do not find this to be such a case
 
 
 [44]
 If the Commission recommends against federal recapture, the Departments of Agriculture and the Interior, or any other federal agency, could still require that the effective date of any order issuing a new license be stayed for up to two years, thereby affording Congress an opportunity to overrule such a determination. See note 5 supra. Presumably the Band could appeal the initial agency order, cf. infra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 209--210, although any judicial injunction against a new license would probably have to be stayed while Congress had the two-year period to itself overrule the Commission determination
 
 
 [45]
 See supra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 203 and notes 18, 22
 
 
 [46]
 See, e.g., Abbott Laboratories v. Gardner, 387 U.S. 136, 148--149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (ripeness doctrine 'protect(s) the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties')
 Indeed, the question whether the Band has a veto power over unwanted disposition of its tribal lands was only appealable because annual licenses have been issuing. Had that question not been inextricably linked to the Band's interpretation of § 15(a), see supra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 204--205, it is doubtful we would have had jurisdiction, under the 'party * * * aggrieved by an order' standard of § 313 of the Federal Power Act, 16 U.S.C. § 825l (1970), to review the portion of Opinion No. 664 addressing that question. Cf. Pacific Gas & Electric Co. v. FPC, 165 U.S.App.D.C. 371, 383--384, 506 F.2d 33, 45--46 (1974) (similar standard of § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b) (1970)). Since our rejection of the Band's interpretation of § 15(a) is valid even assuming arguendo that the Commission erred in its holding concerning the alleged tribal veto power, we decline to address the merits of the Commission's holding.
 
 
 [47]
 Opinion No. 664, 50 FPC at 760--761; see note 11 supra
 
 
 [48]
 50 FPC at 761--763 (emphasis added)
 
 
 [49]
 Id. at 756; see note 18 supra
 
 
 [50]
 See supra, 166 U.S.App.D.C. at --- - ---, 510 F.2d at 203
 
 
 [51]
 See note 38 supra
 
 
 [1]
 The pertinent part of § 4(e) provides:
 (L)icenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservations . . ..
 16 U.S.C. § 797(e).