# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 21, 2010      Decided December 28, 2010

No. 09-1134

HOOPA VALLEY TRIBE,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PACIFICORP,
INTERVENOR

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Thane D. Somerville* argued the cause for petitioner. With him on the briefs was *Thomas P. Schlosser*.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Michael A. Swiger* argued the cause for intervenor PacifiCorp. With him on the brief was *Sam Kalen*.

Before: HENDERSON, BROWN, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: One of the modern U.S. government's major regulatory tasks is to reconcile competing demands on the Nation's natural resources. This case involves one small episode in that larger story. The dispute concerns water resources in the Pacific Northwest, where a hydroelectric plant provides power to some citizens but interferes with the food needs and recreational desires of others.

The Klamath Hydroelectric Project is located on the Klamath River in Oregon and California. The Project serves as a source of electricity for customers in a six-state area of the Pacific Northwest. From 1956 to 2006, a power company known as PacifiCorp operated the Klamath Hydroelectric Project pursuant to a 50-year license granted by the Federal Energy Regulatory Commission. Since the original license expired in 2006, PacifiCorp has operated the Project under successive annual licenses granted by FERC.

The Hoopa Valley Tribe of American Indians holds fishing rights in the Klamath River and subsists in part on the River's trout. In 2007, the Tribe requested that FERC impose conditions on PacifiCorp's annual licenses so as to preserve the Klamath River's trout fishery. FERC declined to do so. In this Court, the Tribe has challenged FERC's refusal as contrary to the Commission's regulations and precedents, and as unsupported by substantial evidence. We disagree and therefore deny the Tribe's petition.

I

The Klamath Hydroelectric Project consists of dams, reservoirs, and powerhouses along the Klamath River and one of its tributaries in Oregon and California.  Since 1956, PacifiCorp has operated the Project pursuant to licenses granted by FERC – specifically, a 50-year license that expired in 2006 and annual licenses since then.

The Hoopa Valley Reservation is located in the Klamath River Basin, and the Klamath River flows through the Tribe's lands.  Tribe members fish in the Klamath River, and the Tribe subsists in part on the River's trout.

Seeking to protect the River's trout fishery, the Tribe petitioned FERC to include new ramping rate and minimum flow requirements in PacifiCorp's annual licenses.  (The ramping rate is the rate at which water levels rise or fall in the river due to project operations.)  FERC decided that such interim conditions were not necessary and denied the Tribe's request.  *See PacifiCorp*, Order Denying Motion for Interim License Conditions, 125 FERC ¶ 61,196 (2008).  The Commission found that the trout fishery was sustaining "certain adverse effects" from the Project but was "nevertheless thriving," and FERC concluded that the Project posed no risk of "irreversible environmental damage."  *Id.* ¶¶ 13, 16.

The Tribe filed a petition for rehearing.  In its denial of that petition, FERC explained that, absent the prospect of irreversible environmental harm from the licensed project, it examines "a request to impose interim conditions under the terms of the license essentially in the same manner as if [it]

were being asked to reopen the license." *PacifiCorp*, Order Denying Rehearing, 126 FERC ¶ 61,236, at ¶ 12 (2009). Under that standard, the Commission will impose conditions "[i]f, with the passage of time, a project is found to have unanticipated, serious impacts on . . . fishery resources." *Id.* ¶ 14; *Ohio Power Co.*, Order Denying Requests for Rehearing, 71 FERC ¶ 61,092, at 61,314 n.43 (1995). Applying that "unanticipated, serious impacts" standard, FERC concluded that there were no such impacts here and that interim conditions were not necessary for the Klamath Project.

The Tribe now seeks review of FERC's decision.

II

The Tribe raises three alternative challenges to FERC's decision.

*First*, the Tribe contends that FERC's decision declining to impose interim conditions was "standardless." The Tribe is incorrect. The Commission explained that it would impose interim conditions on a hydroelectric project if the project was having "unanticipated, serious impacts" on fishery resources. *PacifiCorp*, Order Denying Rehearing, 126 FERC ¶ 61,236, at ¶ 14 (2009). The Commission in turn applied that standard: "Because the project is not having an unanticipated, serious impact on the trout fishery, it was an appropriate exercise of our discretion to deny the Tribe's request . . . ." *Id.* Contrary to the Tribe's argument, the Commission quite plainly articulated and applied a standard in rejecting the Tribe's claims.

*Second*, the Tribe claims that FERC required "irreversible environmental damage" as a prerequisite to imposing interim conditions on the Klamath Project. According to the Tribe, such a requirement is too stringent. But the premise of the Tribe's argument is wrong: The Commission did not require "irreversible environmental damage" as a prerequisite to imposing interim conditions on an annual license. To be sure, the Commission's initial order noted that the Klamath Project was not causing irreversible environmental damage. *See PacifiCorp*, Order Denying Motion for Interim License Conditions, 125 FERC ¶ 61,196, at ¶ 13 (2008). But in doing so, FERC was merely suggesting that a finding of irreversible environmental damage would be *sufficient* to justify interim conditions to protect the trout fishery. FERC never said that a finding of irreversible environmental damage was *necessary* to justify interim conditions here. In any event, to the extent there was any ambiguity in the initial order, the Commission's rehearing order cleared it up. There, the Commission stated explicitly that it could impose interim conditions even "absent a showing of irreversible environmental damage." 126 FERC ¶ 61,236, at ¶ 9; *see also id.* ¶ 10.

*Third*, the Tribe alternatively argues that the "unanticipated, serious impacts" standard adopted by the Commission in the rehearing order is inconsistent with FERC's precedents and regulations. We disagree. The Commission has long applied the "unanticipated, serious impacts" standard in deciding whether to reopen an *existing* license. *See Ohio Power Co.*, Order Denying Requests for Rehearing, 71 FERC ¶ 61,092, at 61,314 n.43 (1995). FERC decided to also employ that standard here because, the Commission explained, it examines "a request to impose interim conditions under the terms of the license essentially in

the same manner as if [it] were being asked to reopen the license." 126 FERC ¶ 61,236, at ¶ 12. The Commission's analysis adheres to its statutory obligation to issue annual licenses "under the terms and conditions of the existing license." 16 U.S.C. § 808(a)(1). That statutory provision was designed to "preserv[e] the *status quo* at the expiration of a long-term license." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Fed. Power Comm'n*, 510 F.2d 198, 206 (D.C. Cir. 1975). FERC preserves the status quo in this context by treating annual licenses and long-term licenses alike. Applying the same standard in both contexts as FERC did here is, therefore, an entirely sensible way to fulfill the Commission's statutory obligation.

Contrary to the Tribe's claim, moreover, the "unanticipated, serious impacts" test is consistent with 18 C.F.R. § 16.18(d). By its terms, § 16.18(d) provides only that "the Commission may incorporate additional or revised interim conditions if necessary and practical to limit adverse impacts on the environment." As the Commission has correctly explained, that broadly worded regulation grants FERC considerable discretion in deciding when to condition annual licenses. 126 FERC ¶ 61,236, at ¶ 17; *see also Wash. Water Power Co. v. FERC*, 201 F.3d 497, 502 (D.C. Cir. 2000) (agency interpretation of its own regulation prevails "unless it is plainly erroneous or inconsistent with the regulation") (citation omitted). The Commission has exercised its discretion under § 16.18(d) by adopting the "unanticipated, serious impacts" standard to guide its interim conditions analysis. We find FERC's decision consistent with the regulation.[1]

---

[1] In this context, the "unanticipated" prong of the test does not meaningfully restrain the Commission from imposing interim

Finally, the Tribe suggests that FERC has never before applied the "unanticipated, serious impacts" test in an interim conditions case. That is true, but there have not been many cases with circumstances like those present here. The Commission may articulate and apply the standard now. Agencies have authority to establish legal standards "by general rule or by individual, *ad hoc* litigation." *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). That is all FERC has done here, and we find its decision reasonable and reasonably explained.

## III

The Tribe further suggests that FERC's decision – namely, that the Project was not causing "unanticipated, serious impacts" – lacked sufficient factual support in the record. We disagree.

Based on evidence from a separate Department of the Interior hearing and from FERC's own Environmental Impact

conditions. Because hydroelectric power licenses can last for as long as 50 years, environmental impacts on fishery resources that are identified after the license period has ended almost certainly will have been "unanticipated" at the time of the original licensing. As a result, FERC's analysis in deciding whether to impose interim conditions usually will boil down to its assessment of whether the impacts on fishery resources are sufficiently "serious" to justify interim conditions. One situation that qualifies as "serious" under this standard occurs when the project is causing "irreversible environmental damage." *Cf. Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 962 F.2d 27 (D.C. Cir. 1992); *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC*, 876 F.2d 109 (D.C. Cir. 1989).

Statement, the Commission concluded that the Klamath River trout fishery had sustained "some adverse effects" but was nevertheless "thriving." *PacifiCorp*, Order Denying Motion for Interim License Conditions, 125 FERC ¶ 61,196, at ¶ 16 (2008). The Tribe questions that conclusion, arguing that FERC cites unreliable data (based on catch rates) and has chosen the wrong side in a battle of experts.

This controversy presents "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989). FERC acknowledged conflicting evidence and weighed the testimony of dueling experts. There was evidence on both sides; we thus have no basis to overturn the Commission's resolution of this debate. The Commission's conclusion is based on substantial evidence. *Cf. Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746-47 (D.C. Cir. 2001).

\* \* \*

We deny the Hoopa Valley Tribe's petition for review.

*So ordered.*