CONFEDERATED TRIBES AND
BANDS OF the YAKIMA IN-
DIAN NATION, Petitioner,

Malcolm Baldridge, Secretary of
Commerce, Petitioner,

National Wildlife Federation,
Petitioner-Intervenor,

and

Washington State Department of Fisher-
ies and Washington State Department
of Game, Intervenors,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

and

Public Utility District No. 1 of Chelan
County, Washington, Intervenor.

Nos. 82–7561, 82–7562 and 83–7038.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 8, 1983.

Decided June 7, 1984.

As Amended Oct. 30, 1984.

Tim Weaver, Hovis, Cockrill & Roy, Yakima, Wash., for Yakima Indians.

Carol E. Dinkins, Robert L. Klarquist, David C. Shilton, Dept. of Justice, Washington, D.C., for Baldridge & Secr. of Commerce.

Terence L. Thatcher, National Wildlife Federation, Portland, Or., for National Wildlife Fed.

Paul S. Majkut, Kenneth O. Eikenberry, Washington Dept. of Fisheries & Game, Olympia, Wash., for Washington State Dept. of Fisheries & Game.

Thomas P. Schlosser, Ziontz, Pirtle, Morrisset, Ernstoff & Chestnut, Seattle, Wash., for Colville Conf. Tribe.

Stephen R. Melton, Acting Gen. Counsel, Jerome M. Feit, Sol. Joshua Z. Rokach, Atty., Washington, D.C., for F.E.R.C.

James Vasile, Morgan, Lewis & Bokius, Washington, D.C., for Public Utility Dist. No. 1.

Before ANDERSON and FLETCHER, Circuit Judges, and EAST,[*] District Judge.

J. BLAINE ANDERSON, Circuit Judge:

On November 23, 1982, the Federal Energy Regulatory Commission (FERC or Commission) upheld an order granting Chelan County Public Utility District No. 1 (Chelan) a new license for the operation of Rock Island Hydropower Project No. 943. The license is for a forty-year term. The National Marine Fisheries Service of the Department of Commerce (NMFS), the Washington State Departments of Fisheries and Game (Washington), the National Wildlife Federation (NWF), and the Confederated Tribes and Bands of the Yakima Indian Nation (Yakima) petition this court for review. We grant the petitions, set aside the license, and remand to FERC.

## I. BACKGROUND

### A. *Facts*

The Rock Island Project was originally licensed on January 21, 1930 by the Federal Power Commission. The license authorized the construction of Rock Island Dam, the first dam to span the Columbia River. In 1952, Chelan became a joint licensee of the project and in 1980 became the sole licensee.

Rock Island originally had a single powerhouse. In 1974, the license was amended, allowing construction of a second powerhouse. The second powerhouse was completed in 1979 and has increased the generating capacity of Rock Island to 622.5 megawatts.

Rock Island is one of ten hydroelectric projects on the Columbia River. Six of those projects are federally owned and op-

[*] The Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

erated. Four, including Rock Island, are owned and operated by three public utility districts pursuant to license. These four projects utilize five dams and are located next to one another on the middle stretch of the Columbia.

As with all dams, Rock Island has a significant impact on the environment, especially anadromous fish runs. In the Pacific Northwest, juvenile anadromous fish (chinook, coho and sockeye salmon, and steelhead trout) utilize the Columbia River and its tributaries to migrate to the Pacific Ocean where they mature. As adults, the fish travel the same route upstream to spawn. Rock Island Dam has fish ladders and other facilities to assist adult fish migrating upstream, but it has no comparable facilities to enable the juvenile fish to pass through or around the dam. The result is that a significant number of juvenile salmon and steelhead die either as a result of passing through the turbines or because of a phenomenon called "holding over." Holding over occurs when juvenile fish prematurely end migration because of the delays in traveling through impounded water and in trying to pass around a dam. It is the petitioner's concern with the effect of Rock Island Dam on juvenile fish which forms the basis of their appeal.

### B. *Procedure*

The pertinent procedural background of this case begins in 1973 when Chelan applied for and subsequently received an amended license allowing it to construct the second powerhouse. 51 F.P.C. 1141 (1974). At that time, NMFS and Washington intervened and sought the construction of passage facilities for juvenile fish as a condition to the amended license. The Federal Power Commission (FPC), whose functions were transferred to the Federal Energy Regulatory Commission in 1977, did not impose the conditions. Instead, it added "Article 48" to the license which required Chelan to conduct studies in conjunction with federal and state fishery agencies on the effects of the project on the fishery. The result of these studies

was to be a revised "Exhibit S" (fish and wildlife report). This report was to be submitted three years after the second powerhouse was operational. Also, Article 21 of the amended license contained a "reopener" clause which reserved to FERC the right to require modification of the dam's facilities and operations as deemed reasonable and necessary for the development of fish and wildlife resources.

In 1976, Washington petitioned the Commission to modify operations at the Priest Rapids Dam, which is two dams below Rock Island on the Columbia. Similar petitions were filed requesting the modification of operations at four other dams, including Rock Island. All these petitions sought the amendment of existing licenses in order to implement fish protection measures. These five dams are operated by three local public utility districts, including Chelan. In 1979, the Commission consolidated these petitions into a single action, the Mid-Columbia Proceeding. 6 F.E.R.C. ¶ 61,210.

The Commission divided the Mid-Columbia Proceeding into two phases. In Phase I, the Commission ordered an expedited hearing to consider any interim measures necessary to protect the Spring 1979 downstream migration of smolts. In Phase II, the Commission ordered that the usual procedures be followed to reach a long-term solution to the anadromous fish problem. In late 1979, the parties to the Mid-Columbia Proceeding (NMFS, Washington, Oregon Department of Fish & Wildlife, Idaho Department of Fish & Game, Chelan, and the other two licensees) proposed an interim settlement agreement for Phase II. FERC approved the settlement in March, 1980. 10 F.E.R.C. ¶ 61,257. It provides for minimum flows and spills at designated times until 1984. In the meantime, a five-year study investigating a variety of fish protection measures was to commence. Importantly, the Commission recognized the inconclusive nature of the settlement, stating that it "is obviously an interim measure designed to gather data rather than a final resolution of appropriate flows."

In 1977, Chelan applied for a new license, its original fifty-year license being due to expire in January, 1980. In July, 1978, FERC issued its public notice of the application and asked interested parties to comment or intervene by September 18, 1978. NMFS and Washington petitioned to intervene, each noting that further studies were necessary to gauge the effect of the recent modifications to Rock Island and that fish protection measures should be incorporated into the new license. FERC granted intervention.

In January, 1980, and January, 1981, FERC issued annual licenses pending its final decision. Then, on May 13, 1981, the Director of the FERC Office of Electric Power Regulation issued a new license to Chelan, allowing it to continue operation of the project for another forty years. 14 F.E.R.C. ¶ 62,187. Apparently, NMFS and Washington had not been contacted again by FERC after being granted leave to intervene. Also, no hearings were ever held on the relicensing question.

The Director was of the opinion that FERC's obligations to consider fishery issues were being fulfilled by the related Mid-Columbia Proceeding. He noted that the new license contained a "reopener" clause which would permit FERC to impose any necessary fish protection measures once the continuing studies under the Mid-Columbia Proceeding were completed, as well as those done to complete the Revised Exhibit S. Finally, the Director found that no environmental impact statement was required prior to licensing because the continued operation of the project did not involve any changes in the status quo.

NMFS appealed the order to the Commission. Yakima joined in the appeal. The National Wildlife Federation filed a separate petition appealing the order. Washington joined later in NMFS's appeal. The petitioners claimed that the order failed to comply with the Federal Power Act (FPA), the Fish and Wildlife Coordination Act (FWCA), the Pacific Northwest Power Planning & Conservation Act (PNPA), the National Environmental Protection Act (NEPA), and Commission regulations. In essence, petitioners claim that fishery issues must be considered prior to licensing and that they may not be deferred to a separate proceeding. Without a hearing, FERC issued its order on appeal, rejecting NWF's and Washington's appeal as untimely and affirming the Director's opinion that fishery measures could be implemented in the license once the Mid-Columbia Proceeding and the Revised Exhibit S were completed. 19 F.E.R.C. ¶ 61,223. The petitioners requested a rehearing and on November 23, 1983, the Commission again rejected their claims. 21 F.E.R.C. ¶ 61,264. The petition for review to this court followed.

## II. JURISDICTION

■ NMFS, having filed a petition for review in this court within sixty days of the denial of its application for rehearing by the Commission, is properly before this court. 16 U.S.C. § 825*l* (b). Chelan and Washington were granted leave to intervene in the appeal pursuant to Fed.R. App.P. 15(d). No one contests the order granting intervention to these interested parties.

Yakima and NWF also filed timely petitions for review. FERC argues that this court must dismiss these petitions because NWF and Yakima failed to intervene in the license proceeding prior to issuance of the license order. Neither NWF nor Yakima qualify, FERC states, as a "party to a proceeding under this chapter aggrieved by an order issued by the Commission," 16 U.S.C. § 825*l* (b), entitling them to seek review in this court.

■ We disagree. Under the regulations then in force, any "interested person" could appeal staff action. 18 C.F.R. § 7(d) (1981). Both Yakima and NWF appealed the Director's license order to the full Commission and there is no question they qualified as "interested persons."

■ FERC also argues that, in any event, Yakima's and NWF's appeals of the license order to the Commission were untimely. The license order was issued on

May 13, 1981. Interested persons had thirty days in which to appeal to the FERC. *Id.* NMFS moved for an extension of time to appeal. The motion was granted, allowing filing an appeal to and including July 13, 1981. On June 22, Yakima asked permission to join in the extension of time. This motion was never expressly addressed by FERC. Yakima then filed a timely joint appeal with NMFS. FERC considered the issues raised by Yakima in its order on appeal. Under these circumstances, we must conclude that Yakima qualifies as a party to the FERC proceeding and therefore is entitled to be before this court.

Although NWF's situation is more questionable, we need not decide whether its petition for review before this court in No. 82–7562 was timely since its motion to intervene in the appeal to this court was granted in No. 82–7561. NWF is an interested entity and pursuant to a prebriefing conference order it briefed one issue that had been properly raised before the Commission and that was before this court in Nos. 82–7561 and 7038. Neither the court nor the parties would be deprived of briefing on any of the substantive issues nor would any parties' rights be prejudiced were NWF's petition dismissed. Accordingly, we dismiss NWF's petition for review as moot.

### III. FERC'S STATUTORY OBLIGATIONS ON RELICENSING

■ The issue in this case can be stated rather simply: Can the Commission satisfy its obligations under the relevant statutes by deferring consideration and implementation of fishery protection measures until after licensing? While we are sympathetic with FERC's stated practical desire to resolve the fishery questions in a comprehensive proceeding covering all five of the Mid-Columbia Dams, we hold that the statutes require FERC to examine fishery issues before issuance of a license.

■ No factual questions are involved in this case. Only questions of law are presented, which generally receive *de novo* review. However, an agency interpretation of the statute it administers is entitled to deference to the extent the interpretation is reasonable and comports with the intent of the statute. *Committee for an Independent P–I v. Hearst Corp.,* 704 F.2d 467, 473 (9th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983); *see City of Centralia, Washington v. FERC,* 661 F.2d 787, 790 & n. 8 (9th Cir. 1981).

### A. *Statutory Obligations to Consider Fishery Issues Prior to Licensing*

NMFS asserts, and FERC does not dispute, that under the Federal Power Act FERC must make the same inquiry into fishery issues in relicensing as required when initially licensing a project. Section 15(a) of the FPA, 16 U.S.C. § 808(a), governs license renewals and provides that "the [C]ommission is authorized to issue a new license to the original licensee upon such terms and conditions as may be authorized or required under the then existing laws and regulations, or to issue a new license under said terms and conditions to a new licensee" if the United States does not exercise its right to take over the project at the expiration of the original license. No federal take-over is involved in this action and no new entity is seeking the right to operate Rock Island.

Section 15 and the related federal take-over provision, section 14, 16 U.S.C. § 807, were amended in 1968. *See* Pub.L. No. 90–451 §§ 2, 3, 82 Stat. 617 (1968). The house report on the amendments makes it plain that Congress intended the Commission to make the same inquiries on relicensing as on initial licensing:

It provides that the Commission, no earlier than 5 years before the expiration of a license for a project subject to recapture, shall entertain applications for a new license. Just as in the case of original licensing the controlling criteria would be the comprehensive development standard of section 10(a) of the Federal Power Act. In view of this fact the relicensing proceeding would be deemed to involve "initial licensing" within the context of

the Administrative Procedure Act rather than "license renewal."

H.R.Rep. No. 1643, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 3081, 3084. The proposed amendments were submitted to Congress by the Chairman of the Federal Power Commission, Lee C. White. His letter, incorporated into the house report, confirms and supports the report's interpretation of the Commission's duties on relicensing, and notes that in addition to power production, comprehensive development includes the consideration of fish and wildlife conservation, among other public uses. *Id.* at 3089.

In turn, section 10(a), 16 U.S.C. § 803(a), requires the Commission to consider all beneficial public uses when it grants a license. In pertinent part, this subsection conditions the grant of a license on the determination that the project

> will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and for other beneficial public uses, including recreational purposes....

In *Udall v. FPC*, the Supreme Court recognized that the examination of fish and wildlife resources is mandated as part of the consideration of "recreational purposes." 387 U.S. 428, 440, 87 S.Ct. 1712, 1718, 18 L.Ed.2d 869 (1967). As stated by the Court:

> The test is whether the project will be in the public interest. And that determination can be made only after an exploration of all issues relevant to the "public interest," including ... the preservation of anadromous fish for commercial and recreational purposes....

*Id.* at 450, 87 S.Ct. at 1724; *see also California v. FPC*, 345 F.2d 917 (9th Cir.), *cert. denied*, 382 U.S. 941, 86 S.Ct. 394, 15 L.Ed.2d 351 (1965); *Scenic Hudson Preservation Conference v. FPC*, 354 F.2d 608 (2d Cir.1965), *cert. denied*, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

The law, then, is well defined: Prior to issuance of a new license, FERC must study the effect of a project on the fishery resource and consider possible mitigative measures. It is undisputed that in this proceeding the FERC did not undertake this obligation prior to issuing the license. Instead, it deferred full consideration of fish protection in two ways. First, it did not require Chelan to submit an "Exhibit S" (fish and wildlife report) as part of its application nor prior to issuance of the license, as required by FERC regulation. 18 C.F.R. § 4.41 (1981). This exhibit is the primary method used by the Commission to study the project's effect on wildlife (see Part B, *infra*). Second, and most critically, it deferred study and resolution of fish protection issues to the Mid-Columbia Proceeding. FERC argues that deferring consideration of fishery issues is well within its discretion. The statute and the gloss put upon it by the courts warrant another conclusion. FERC must consider fishery issues *before*, not after, issuance of a license. *Udall*, 387 U.S. at 450, 87 S.Ct. at 1724; *see Scenic Hudson*, 354 F.2d at 620.

FERC cites *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543–544, 98 S.Ct. 1197, 1211–1212, 55 L.Ed.2d 460 (1978) as support for the proposition that an agency has discretion to modify its procedures such as done in this case. The opinion in *Vermont Yankee* recognized, however, that such discretion may be circumscribed by statutory mandate. *Id.* at 549 n. 21, 98 S.Ct. at 1214 n. 21. As stated, the statute requires that public interest concerns be evaluated as a *condition* to licensing.

Cases discussing the environmental impact statement requirements of the National Environmental Policy Act, 42 U.S.C. § 4332, are instructive. In *Cady v. Morton*, 527 F.2d 786, 794 (9th Cir.1975), the court stated that "the filing of an EIS should precede rather than follow federal agency action...." (citations omitted). The rationale behind this rule is that inflexibility may occur if delay in preparing an EIS is allowed: "After major investment of both time and money, it is likely that more

environmental harm will be tolerated." *Environmental Defense Fund v. Andrus,* 596 F.2d 848, 853 (9th Cir.1979).

We see no reason why the law should be different under the Federal Power Act. The FPA imposes obligations similar to NEPA. In essence, the court reviews the license with particular concern to see that the Commission has fulfilled all its procedural obligations that must be undertaken prior to its issuance. In this case those procedural obligations include, among other things, prelicensing consideration of fishery issues. In *Scenic Hudson,* 354 F.2d 608, the Second Circuit was presented with an analogous situation involving the correct review of the Commission's decision to license a hydropower project. The court overturned the license on the basis the Commission failed to fully study alternatives to the proposed project and possible fish protection measures as part of its determination the license would be in the public interest. We agree with *Scenic Hudson*'s discussion of the court's reviewing function:

> This court cannot and should not attempt to substitute its judgment for that of the Commission. But we must decide whether the Commission has correctly discharged its duties, including the proper fulfillment of its planning function in deciding that the "licensing of the project would be in the overall public interest." The Commission must see to it that the record is complete. The Commission has an affirmative duty to inquire into and consider all relevant facts.

354 F.2d at 620 (citations omitted); *cf. California v. FPC.* 345 F.2d 917 (9th Cir.1965) (license upheld where FPC gave fishery issues due consideration).

FERC argues that the procedure it is utilizing for Rock Island best comports with its statutory mandate to consider the "comprehensive" picture in its decision to license. *See* 16 U.S.C. § 803(a). Deferral to the Mid-Columbia Proceeding, FERC states, serves this goal because in it fish protection measures for five dams on the central Columbia River are being studied

simultaneously. We agree it is important that fishery issues be addressed with a view to the total system: Storage and spill of one dam necessarily affects the operation of other dams. We do not agree, however, that this makes FERC's procedure in this case proper. First, as we have repeated, the statute and the cases construing it require prelicensing consideration of fishery issues. Second, Section 15(a) of the FPA, 16 U.S.C. § 808(a), expressly provides for the issuance of annual licenses to the prior licensee if the license expires pending the relicensing determination. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. FPC,* 510 F.2d 198, 206–207 (D.C.Cir.1975). In fact, FERC issued annual licenses to Chelan in 1980 and 1981. Clearly, it could have continued to do so if it wished to incorporate the results of the Mid-Columbia Proceeding in the new license. Through an annual license the status quo would have been maintained. *Id.* No harm would accrue to the licensee, as annual licenses must incorporate the terms of the prior license. 16 U.S.C. § 808(a).

We also find FERC's reliance on *California v. FPC,* 345 F.2d 917 (9th Cir.1965), misplaced. That case does not stand for the proposition that FERC may defer fishery issues for later resolution. Unlike here, in *California* the Commission undertook extensive studies of the effect of the New Don Pedro Dam on the Tuolumne River fishery prior to issuance of the license. Specific fish protection measures were incorporated into the license. *Id.* at 921. The license also included a "reopener clause" which gave the Commission the right to modify those conditions in twenty years if further study warranted it. This court upheld the Commission's use of the reopener clause. *Id.* at 924–925. Simply because the new Rock Island license contains a similar clause, reserving FERC the right to incorporate the results of the Mid-Columbia Proceeding, does not mean *California* allows FERC to issue a license before consideration of fishery issues.

We also find unpersuasive FERC's argument that the procedure it used offers

more protection for the fishery than simply issuing annual licenses. This argument is based on FERC's incorporation of the Mid-Columbia settlement agreement's minimum stream flow conditions into the new Rock Island license. The same protections could have been added to an annual license. An annual license must contain the same terms as the expired license, 16 U.S.C. § 808(a), but the Rock Island license, as amended in 1974, contained a "reasonable modifications" clause in Article 21. The Mid-Columbia Proceeding interim settlement agreement could have been incorporated through that clause.

While we see no substantial benefit from the procedure used by FERC, we do see a distinct possibility for harm resulting from utilization of a procedure designed to impose fish protection measures in a modification proceeding. First, a modification proceeding is not the same as a relicensing proceeding. Subject to the requirement that its decision be in the public interest, the Commission has broad discretion to impose fish protection conditions when it issues a new license. Notwithstanding a reopener clause, FERC may not "amend" a license in a modification proceeding without the licensee's consent. 16 U.S.C. § 799. Plainly, therefore, the Commission's discretion is curtailed in a modification proceeding. Also, as a practical matter, the method used by FERC here removes the incentive for a speedy and efficient resolution of fishery issues. If these issues must be examined and resolved prior to licensing, the licensee has an incentive to submit all the required data as quickly as possible. The same incentive is not present in the procedure used here where fishery issues are deferred to the future. The licensee may very well attempt to forestall the imposition of protection measures because these might affect the project's power production. *See Environmental Defense Fund v. Andrus,* 596 F.2d at 853.

On the basis it violated the Federal Power Act, we reverse the order granting Chelan's license to operate Rock Island Dam and remand to the Commission. Our resolution of this case on the FPA question

makes it unnecessary to discuss the Pacific Northwest Electric Power Planning & Conservation Act (PNPA) and the Fish and Wildlife Coordination Act (FWCA), in detail.

We note briefly that these acts place additional mandates on the Commission in a relicensing proceeding. The purpose of the FWCA is to ensure that "wildlife conservation shall receive *equal consideration* and be coordinated with other features of water resource development programs...." 16 U.S.C. § 661 (emphasis added). "Equal consideration" is insured through the requirement that FERC and other agencies responsible for management of natural resources consult with federal and state wildlife agencies prior to authorizing a project. 16 U.S.C. § 662; *see Udall v. FPC,* 387 U.S. at 443–444, 87 S.Ct. at 1720–1721. The PNPA is specifically directed to the Columbia River system and, unlike the FWCA, it imposes substantive as well as procedural obligations on FERC. In pertinent part, it requires federal agencies responsible for managing hydropower projects on the Columbia system to

> exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides *equitable treatment* for such fish and wildlife with the other purposes for which such system and facilities are managed and operated....

16 U.S.C. § 839b(h)(11)(A)(i) (emphasis added). One purpose of the PNPA is to place fish and wildlife concerns on an equal footing with power production. H.R.Rep. No. 976 (Part I), 96th Cong.2d Sess. 49, *reprinted in* 1980 U.S.Code Cong. & Ad. News 5989. In this respect, the PNPA supplements the Federal Power Act. *Id.* at 57. We have no doubt that if FERC failed its Federal Power Act obligation to consider fishery issues prior to licensing, it concomitantly failed to meet its obligation to give fish "equal consideration" under

the FWCA and "equitable treatment" under the PNPA.

### B. *The Exhibit S and Consultation Requirements*

NMFS also argues that FERC violated its own regulations when it issued the license before Chelan had submitted "Exhibit S," a report on the projected effect of the dam on fish and wildlife resources. NMFS, as well as the other petitioners, makes a related claim that FERC violated its duty to consult with fishery agencies and Indian tribes prior to license issuance. We agree, notwithstanding FERC's assertion that it has the discretion to modify the filing requirements in its regulations.

At the time of Chelan's application for a new license, 1977, FERC regulations provided that "there shall be filed as part of an application for license the following exhibits." What follows is a list, including Exhibit S, which is

a report on the effect, if any, of the project upon the fish and wildlife resources in the project area or in other areas affected by the project and proposals for measures considered necessary to conserve and, if practicable, to enhance fish and wildlife resources affected by the project. The exhibit shall include functional design drawings of any fish ladders proposed to be constructed in compliance with section 18 of the Federal Power Act, such other facilities or developments as may be necessary for the protection, conservation, improvement and mitigation of losses of fish and wildlife resources in accordance with section 10(a) of the Act, and cost estimates for such facilities and developments. The Applicant shall prepare this exhibit on the basis of studies made after consultation and in cooperation with the U.S. Fish and Wildlife Service, Department of the Interior, and appropriate state fish and wildlife agencies and in the case of public lands, advise Federal agencies having jurisdictional responsibilities therefor of its proposed plans. The exhibit shall include a statement on the nature and extent of Applicant's consultation and coop-

eration with the above agencies. To the extent those aspects of fish and wildlife related to recreation are covered in Exhibit R, a specific reference to Exhibit R will suffice.

18 C.F.R. § 4.41 (1976).

■ It is a well-known maxim that agencies must comply with their own regulations. *E.g., Memorial, Inc. v. Harris,* 655 F.2d 905, 910–911 n. 14 (9th Cir.1980). We do not agree with FERC's claim that Exhibit S is the type of filing requirement that an "agency may relax, modify or waive ...." *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 242 (D.C. Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) (citations omitted). Exhibit S is plainly designed to facilitate FERC's *duty* to consider fishery issues prior to licensing. This is not the same as the situation in *Papago,* which involved the reviewability of an order rejecting a motion to overturn a rate filing for patent defects. The *Papago* court found the order nonreviewable because it involved a requirement that was an aid to the Commission's exercise of its discretion over the decision to accept a rate filing. Exhibit S, however, is tied to FERC's obligation to investigate fishery matters prior to licensing. Also, this is not a situation where the parties are contesting the adequacy of the report—none was filed. No alternative method of consideration of fishery information was utilized.

The Exhibit S report is directly related to FERC's duty of consultation. The FWCA and the PNPA each require FERC to consult with fishery agencies and, in the case of the PNPA, Indian tribes prior to licensing. 16 U.S.C. § 662(a) (FWCA); 16 U.S.C. § 839b(h)(11)(B) (PNPA). Exhibit S aids that obligation because it is to be prepared by the applicant "on the basis of studies made after consultation and in cooperation with the U.S. Fish and Wildlife Service, Department of the Interior, and appropriate state fish and wildlife agencies." 18 C.F.R. § 4.41 (1981). The report must also include statements on the nature and extent of the cooperation and consultation

between the applicant and the agencies. *Id.*

It is not enough the FERC gave notice of Chelan's application to the agencies and Indian tribes. The consultation obligation is an affirmative duty. Also, it is safe to say that the respective fishery agencies believed the consultation process would take place in the preparation of Exhibit S. Instead, however, FERC issued the license before the exhibit was submitted.

The Commission argues that it was proper for it to defer the Exhibit S report pending the completion of additional studies. Additional studies are necessary, FERC states, because the full impact of the modifications authorized at Rock Island in 1974 have not yet been sufficiently analyzed. That may well be true. But to the extent those studies are necessary, FERC did not have to issue the permanent license when annual licenses could have been used pending their completion.

The Exhibit S and consultation requirements are the primary means by which FERC is to comply with its duty to examine fishery issues prior to licensing. FERC's failure to follow those requirements further supports reversing the license order and remanding to the Commission.

C. *Environmental Impact Statement*

■ NMFS also argues that FERC was required to prepare an environmental impact statement (EIS) prior to relicensing Rock Island Dam. We agree.

Having been built in the 1930's, Rock Island predated the National Environmental Protection Act (NEPA) and its requirements for preparation of impact statements for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An EIS was, however, prepared in 1974 when the modifications to the dam were proposed. The question before us is whether an EIS is required prior to the decision to relicense the project. Surprisingly, we have found no cases which have addressed this issue in the context of relicensing hydropower projects by FERC.

■ "[A]n agency's determination that a particular project does not require the preparation of an EIS is to be upheld unless unreasonable." *Foundation for North American Wild Sheep v. Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982) (footnote omitted) (citing *Portela v. Pierce,* 650 F.2d 210, 213 (9th Cir.1981); *City & County of San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980); *City of Davis v. Coleman,* 521 F.2d 661, 673 (9th Cir.1975)). We may conclude the agency acted unreasonably if substantial questions are raised concerning whether the project may significantly affect the quality of the human environment. *Id.* at 1178.

There is no doubt that if this action involved the decision to license new construction of a hydropower project such as Rock Island, an EIS would be required. *See Greene County Planning Board v. FPC,* 455 F.2d 412 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). FERC argues that this situation is different because the dam has been in operation for fifty years. FERC relies on cases which hold that when there will be no change in the status quo, such that the action is simply "a phase in an essentially continuous activity," no EIS is necessary. *City & County of San Francisco,* 615 F.2d at 501; *see Burbank Anti-Noise Group v. Goldschmidt,* 623 F.2d 115, 116–117 (9th Cir.1980); *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1003 (D.C.Cir.1979); *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Westside Property Owners v. Schlesinger,* 597 F.2d 1214, 1217–1218 (9th Cir.1979). Rock Island was relicensed under the same terms as the prior license and therefore FERC argues that there has been no change in the status quo. Viewed narrowly, relicensing fits within the FERC's characterization and comports with the cases cited above: *Burbank Anti-Noise Group* (no EIS is required when federal government aided the

purchase of an existing airport by private group); *City & County of San Francisco* (no EIS required when Navy leased, with essentially the same terms as the prior lease, an existing shipyard to a private firm); *Committee for Auto Responsibility* (lease of existing parking lot to private firm did not change the status quo); *Westside Property Owners* (formalization after enactment of NEPA of long-existing agreement and program between Germany and United States to train German pilots did not require EIS).

NMFS characterizes relicensing as much more than a phase in continuous activity. Because of the procedures required on the decision to relicense, the purposes of relicensing, and the irreversible commitment of a water resource if relicensing is upheld, we agree.

A primary consideration in relicensing of projects now owned by a state or municipality is whether FERC should recommend to Congress recapture (or takeover) by the United States. 16 U.S.C. § 807. Although takeover is not among FERC's options in this case, since Chelan is a municipality as defined in 16 U.S.C. § 796(7), *see* 16 U.S.C. § 828(b) (takeover not permitted of projects owned by a state or municipality), FERC still retains several options that it must consider in an EIS. FERC can relicense to Chelan, relicense to another licensee, or issue a non-power license. *See* 16 U.S.C. § 808(a) & (b).

The "[C]ommission is authorized to issue a new license to the original licensee upon such terms and conditions as may be authorized or required under then existing laws and regulations." 16 U.S.C. § 808(a). As discussed earlier, the decision to relicense is to be based on the same inquiry as original licensing, including a consideration of all relevant harms and benefits to public uses related to the project. The Commission must determine whether any changes in operations are required by "then existing" law and has full authority to impose such changes.

The Commission must also determine whether a non-power license should be is-

sued. 16 U.S.C. § 808(b). Non-power licenses may be issued at the motion of an interested party or on the Commission's own motion. Seemingly, the Commission would determine that a non-power license is necessary if it concluded that power production needs were outweighed by recreational or environmental considerations.

Both the consideration of what conditions to attach to a new license and the questions involved in determining whether a non-power license is necessary necessitate the information prepared in an environmental impact statement.

The purposes of the procedure imposed by Congress on relicensing underscore the necessity for an EIS. As the Commission stated when it proposed the amendments to the relicensing procedures in 1968:

> The Congress limited the maximum term of any license issued by the Federal Power Commission to 50 years and thereby preserved for the Nation, acting through subsequent Congresses, a full opportunity to reevaluate the best use of each project upon expiration of the license. We now recommend that Congress fix appropriate procedures for the reevaluation of each project in light of contemporary and prospective public needs.

Letter from Lee C. White, *supra,* at 3086. Thus, the Federal Power Act contemplates much more than a mere continuation of the status quo when the decision is made to relicense. Relicensing is substantially equivalent to issuing an original license and one would assume that the FERC regulations governing the preparation of an EIS generally apply. *See* 18 C.F.R. §§ 2.80, 2.81 (1981).

Relicensing, then, is more akin to an irreversible and irretrievable commitment of a public resource than a mere continuation of the status quo. *See Environmental Defense Fund v. Andrus,* 596 F.2d 848, 852 (9th Cir.1979); *Port of Astoria v. Hodel,* 595 F.2d 467, 477–478 (9th Cir.1979). Simply because the same resource had been committed in the past does not make relicensing a phase in a continuous activity. Relicensing involves a new commitment of

the resource, which in this case lasts for a forty-year period. *See Hodel*, 595 F.2d at 477.

Nevertheless, FERC argues that it has not violated NEPA because the only environmental fact in question is fish protection and that question is being addressed in the Mid-Columbia Proceeding. As noted above, however, an EIS must be prepared before a project is approved, and the Mid-Columbia Proceeding does not satisfy that obligation. *See Environmental Defense Fund v. Andrus*, 596 F.2d at 853; *Cady v. Morton*, 527 F.2d at 794 & n. 4.

In sum, we conclude that the FERC acted unreasonably when it issued the license to Chelan without first preparing an EIS.

## IV. INDIAN FISHING RIGHTS

Yakima contends that the licensing violated its treaty fishing rights. Yakima states further that a resolution of the statutory issues may make it unnecessary to reach this issue. We accept Yakima's offer to defer consideration of this question until there is a subsequent appeal, if any, after our remand to FERC. We believe it proper for FERC to be first to address Yakima's claims after development of a full record. *See FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 332–333, 96 S.Ct. 579, 582–583, 46 L.Ed.2d 533 (1976).

## V. CONCLUSION

The Commission failed to meet its statutory obligation to consider fishery issues prior to licensing. It also unreasonably failed to prepare an EIS prior to licensing. Accordingly, the

PETITION FOR REVIEW IS GRANTED and the ORDER IS SET ASIDE.