## MICHIGAN DEPARTMENT OF EDUCATION, Petitioner,

v.

## UNITED STATES DEPARTMENT OF EDUCATION, Lauro Cavazos, Secretary, Respondent.

### No. 88–3560.

United States Court of Appeals, Sixth Circuit.

Argued March 30, 1989.

Decided May 25, 1989.

Leigh M. Manasevit, Asst. Atty. Gen. (argued), Brustein & Manasevit, Washington, D.C., for petitioner.

Terrell H. Bell, Secretary of Educ., Dept. of Educ., Ronald B. Petracca (argued), U.S. Dept. of Educ., Office of General Counsel, Washington, D.C., for respondent.

Before BOGGS and NORRIS, Circuit Judges, and BALLANTINE, District Judge.[*]

BOGGS, Circuit Judge.

The Michigan Department of Education (MDOE) appeals a final decision of the United States Department of Education (USDOE) finding, as the result of an audit, that MDOE misexpended federal funds in the conduct of its vocational rehabilitation program. This case arises under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the purpose of which is "to develop and implement, through the research, training, services, and the guarantee of equal

[*] The Honorable Thomas Ballantine, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

opportunity, comprehensive and coordinated programs of vocational rehabilitation and independent living." 29 U.S.C. § 701 (1982). We affirm.

## I

The MDOE was awarded a grant of federal funds by the USDOE. The grant was awarded under a grant program administered by the USDOE's Rehabilitative Services Administration (RSA). The actions giving rise to the audit disallowance were taken by the Acting Regional Commissioner (ARC) of the RSA.

In dispute are fiscal year 1982 federal funds which the USDOE, after having conducted an audit, alleges Michigan misexpended in conducting its vocational rehabilitation program. Michigan challenged the finding in an administrative hearing before the Education Appeals Board (EAB), a body within the USDOE which has the power to adjudicate appeals of adverse audit decisions. 20 U.S.C. § 1234(a). The EAB upheld the adverse audit finding and, since the Secretary of Education did not disturb that determination, the initial decision of the EAB has become the USDOE's final decision. 20 U.S.C. § 1234a(d). This is the decision on appeal.

The grant in this case was made under Title I of the Rehabilitation Act, as it stood prior to the 1986 amendments. Under the statutory scheme, funds are awarded to states with a state plan approved by the USDOE, based on an allotment formula derived from state population figures. An individual with a physical or mental disability that constitutes a substantial handicap to employment is eligible for vocational rehabilitation programs if the individual can reasonably be expected to benefit from vocational rehabilitative services. Each handicapped individual is required to be served in accordance with an individualized written rehabilitation program developed jointly by a vocational rehabilitation counselor and the individual. The plans must be reviewed annually. Title I sets out a comprehensive description of services which may be provided with grant funds. In general, such services are "any goods or services

necessary to render a handicapped individual employable."

Section 3 of the Act authorizes the Secretary to take whatever actions are necessary to ensure that funds are expended only for the purposes contemplated by the Act. Each grantee must keep records to account for its use of grant funds and to facilitate an effective audit. Further, the Secretary has statutory authority to conduct an audit. The Act also allows the Secretary to promulgate any regulations necessary to exercise his authority under the Act. The USDOE also has the power to audit state programs to ensure the proper use of federal funds. However, any final decisions regarding action pursuant to an audit must be made by the Secretary.

The Secretary delegated his authority under the Act, with some reservations, to the Assistant Secretary for Special Education and Rehabilitative Services. The Assistant Secretary, in turn, delegated the authority to the Commissioner of Rehabilitative Services, who in turn delegated it to the Regional Commissioners of the Rehabilitative Services Administration. Each delegation was recorded in a memorandum contained in the record. This last delegation is the delegation that is disputed by the parties.

Michigan's Department of Education (MDOE) implements and administers the vocational rehabilitative program in the state. During the audit period, fiscal year 1982, Michigan employed 250 vocational rehabilitation counselors located in 36 field offices across the state who provided services to some 43,000 individuals. Counselors have primary responsibility for determining a client's eligibility. This is done through the use of medical exams and reports, diagnostic tests, ability evaluations and the issuance of a certificate of eligibility. Counselors also develop a comprehensive vocational diagnosis which is then used in developing an individualized written rehabilitation program tailored to the specific needs of the client. The written program outlines the expectations and responsibilities of the client and counselor.

Between April 1983 and January 1984, the USDOE's Office of Inspector General,

Office of Audit, conducted an audit of the Michigan program. The audit covered fiscal year 1982 expenditures and evaluated the allowability of expenditures made for the vocational rehabilitation of Michigan's clients. During the audit period, there were 66,368 authorizations for client service expenditures totalling $11,244,739, of which $8,995,791 was the federal share. The auditors reviewed a random, stratified sample of 259 of these authorizations, and tested the sample in the areas of: client eligibility; individualized written rehabilitation programs; vocational goal selection; similar benefits; proper authorization of case service expenditures; proper payment and billing of case service expenditures; and appropriate case closure. The auditors made findings regarding compliance with applicable statutes and regulations.

The auditors determined that unallowable expenditures were made in thirteen of the 259 samples. Employing their sampling technique, the auditors projected the amounts disallowed in the thirteen cases out of 259 against the total universe of 66,368 client case service expenditure authorizations. This produced a disallowance of $898,248. This amount was reduced to $718,598 in that federal funds accounted for only eighty percent of the total expenditures.

Michigan disputed nine of the sample cases disallowed by the auditors. Three of the cases are discussed in the state's brief. Sample case 51 concerned whether proper authorization was given for payment of repairs made to a client's knee, ankle and foot orthosis. The client needed the braces to compensate for her limited mobility which was the result of a birth defect. Her doctor recommended that the repairs be performed immediately. The repairs were made and paid for; although authorization was not given until later. At the time the repairs were needed, the client's case worker was on maternity leave and the case worker's supervisor was out of the office. The ARC disallowed this expenditure alleging a violation of 34 C.F.R. § 361.44, which requires prior written authorization for the purchase of services except in emergency situations, in which case there must be prompt confirmation of authorization.

In sample case 162, the auditors alleged that Michigan had failed to give appropriate consideration to similar benefits that were available to the client other than those provided by the vocational rehabilitation program. Michigan demonstrated that an investigation had determined that no similar benefits were available. In the final letter of determination, explained below, the ARC dismissed the auditors' allegation. However, the ARC then took exception to $104 that Michigan had received as a tuition refund from a technical school the client had attended. The final decision found that Michigan did not meet its burden of proof to demonstrate that the money was returned to the Department. The amount of the unreturned refund in this case was also projected against the universe of expenditures.

Sample case 84 was disallowed by the auditors who alleged that "the vocational goal selected [for this client] was inappropriate considering the client's disability." The client was disabled by cerebral palsy and was attending a business school on a trial basis until she withdrew and stopped receiving vocational rehabilitation. The final decision indicated that the client's own assessment that the pressure from her family to pursue a particular goal was a "hassle" should have alerted the counselor to the need for a diagnostic study. The final decision agreed and upheld the disallowance.

Other cases are discussed in the USDOE's brief. For example, sample case 144 involved a client who was found eligible for services and was given $488 to pay for the cost of attending college because he was suffering from asthma. However, the examination reports for this client found no limitation on the physical activities that he could engage in, and the only environmental condition which he had to avoid was dust. The reports concluded that he could work full time.

The USDOE also sheds some light on the three cases discussed in the state's brief.

In sample case 84, referred to above, although a diagnostic study is required before services are rendered to a client, no such study was performed in this case. In sample case 51, services were purchased without authorization as required under the regulations. Finally, in sample case 162, the tuition refund was received by the state, and the state did not show that it either used those funds to provide services to another client or returned them to the federal government.

The results of the audit of these 259 cases were used to project total unallowable expenditures for the year. This projection was recalculated by the ARC using the ratio estimation approach, which involves multiplying the percentage of sampled expenditures found to be unallowable by total expenditures. This is done within each strata, or level of expenditures (the expenditures were stratified into five groups, with each group consisting of cases with a specified level of expenditures). The random sample of 50 authorizations from strata I encompassed $2,592 in expenditures. The ARC determined that $121.89 of the sampled expenditures, or 4.7025462%, were unallowable. The ARC then multiplied this percentage by the total amount of expenditures in strata I to project the total amount of unallowable program expenditures in this strata. This procedure was done by the ARC for each of the five strata. The final total of unallowable expenditures was multiplied by .80 because the federal share of the expenditures is 80%.

After this review of the audit report, the ARC issued the final letter of determination on May 29, 1986. That letter reconsidered four of the thirteen sample cases which were disallowed by the auditors. The letter sustained three of the four disallowances, although one of the three was sustained on a basis unrelated to the auditors' finding. The fourth disallowance was reversed. In addition, the letter recalculated the amount of the audit disallowance "using a ratio estimation approach. This alternative estimating technique addresses ... [Michigan's] concerns since it overcomes weaknesses in the auditors' original technique." As a result, the ARC reduced the refund demand to $465,732. Michigan appealed to the EAB.

On November 5, 1986, Michigan filed a motion to dismiss with the EAB. The motion argued that the ARC did not have the authority to issue the final letter of determination in this case. Michigan also argued that the sampling technique used to support the final determination in this case failed to provide adequate notice as to the basis for the disallowed expenditures, except for the thirteen sample cases. On December 1, 1986, the ARC filed a response, arguing that he had the delegated authority to issue the final letter of determination, and that the sampling methodology gave adequate notice as to the bases for the disallowance. The motion was denied on April 10, 1987, on the grounds argued in the ARC's response. The EAB also noted that "departmental directives" relating to the issuance of final letters of determination obviated the need for a formal delegation of authority to issue such letters. Finally, the EAB refused to dismiss the case without some showing that the sampling method was erroneous.

On May 22, 1987, Michigan filed a motion for Oral Argument and Evidentiary Hearing. The ARC did not oppose the motion. However, the motion was denied subject to reconsideration insofar as it requested an evidentiary hearing, although oral argument was granted. Michigan filed a motion for reconsideration on July 14, 1987, and the ARC opposed the request but favored the submission of written testimony. The motion for reconsideration was denied on July 22, 1987, although Michigan was allowed to supplement the records with affidavits. Oral argument was held on July 30, 1987, at which time Michigan supplemented the record with two affidavits.

The EAB's initial decision has become the final decision of the USDOE. The initial decision rejected Michigan's arguments that defects in the delegation of authority to the ARC deprived him of the authority to issue the final letter determination. First, the EAB panel did not construe the delegation to be defective. Second, the

panel reiterated its view that regardless of the validity of the delegation, USDOE directives obviated the need for a delegation of authority. The EAB failed to address whether a defect in the form of the delegation, as opposed to the signing of the document, was of any import. The initial decision further disagreed with Michigan's position that the judgments of vocational rehabilitation counselors should be afforded deference when determining whether misexpenditures have occurred. The panel concluded that the statute and regulations provide adequate objective criteria to test program compliance without deference to the judgments of the vocational rehabilitation counselors. The panel also rejected Michigan's contention that expertise in vocational rehabilitation counseling was needed to review the program.

The panel also ruled that the sampling methodology used by the auditors was not erroneous and did not unfairly deprive Michigan of notice as to the reasons for disallowance. The decision then examined each of the disputed sample cases and found that in each case there was insufficient evidence to rebut the ARC's allegations of misexpenditures. The panel rejected Michigan's contention that the universe of expenditures employed in the auditor's projection of disallowances erroneously included expenditures related to a state residential rehabilitation facility as compared to individual client expenditures. The panel found no basis upon which to make such a distinction.

In addition, the EAB did not rule on whether the ARC could lawfully claim interest on the refund demand, finding that it lacked the jurisdiction to address the issue. Finally, the EAB declined to consider equitable factors in determining that refund of the entire demand of $465,732 was appropriate.

In accordance with 34 C.F.R. § 78.82, each party submitted initial and responsive comments on the EAB's initial decision. These comments were forwarded to the Secretary along with the initial decision. The Secretary took no action regarding the initial decision, and, thus, it has become the final agency decision from which Michigan petitions for review. 20 U.S.C. § 1234a(d). Subsequently, Michigan received a bill for prejudgment interest on the refund demand; however, as soon as the USDOE Financial Management Service learned of the pendency of this appeal, on March 24, 1989, it retracted its interest demand.

## II

On appeal, Michigan argues that the ARC issued the final letter of determination without any statutory authority. Second, Michigan argues that the final decision is not based on substantial evidence in that it erroneously used sampling to extrapolate a refund in an isolated instance involving the refund of a tuition payment which the ARC alleges was not returned to the federal government, as well as other defects in calculation. Finally, Michigan claims that the USDOE cannot demand prejudgment interest for the period after a final decision was reached.

The USDOE argues that the final decision is supported by substantial evidence; that the random sampling technique was used properly in projecting the amount of unallowable expenditures; and that the EAB lacked authority to rule on whether prejudgment interest could be charged to the state. Further, the USDOE claims that there was no improper delegation of power because the Secretary retains final responsibility for the final decision. A "redelegation memorandum" which precludes the ARCs from acting on appeals of more than $100,000 is not relevant here, because issuing a final audit determination is not equivalent to acting on an appeal of that determination. Thus, the USDOE argues that the Secretary's final decision should be upheld.

The scope of review in this case is determined by statute. "The findings of fact by the Board, if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to the Board to take further evidence...." 20 U.S.C. § 1234d(c). As regards the challenge to the ultimate delegation of the Secretary's authority to the

ARCs, the court must be mindful of the long-standing rule that "an agency interpretation of the statute it administers is entitled to deference to the extent the interpretation is reasonable and comports with the intent of the statute." *Confederated Tribes and Bands of the Yakima Indian Nation v. Federal Energy Regulatory Commission,* 746 F.2d 466, 470 (9th Cir. 1984) (citations omitted). *See also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Although all administrative decisions are subject to review under either the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* or the agency's enabling statute, *Wayne State University v. Cleland,* 590 F.2d 627, 631 (6th Cir.1978), courts are limited to a review of "whether regulations have been promulgated pursuant to a congressional grant of authority." *Id.* at 632. "[A]gency action is entitled to a presumption of regularity, although it is not shielded from a thorough, probing, in-depth review." *Ibid.* " 'The court is not empowered to substitute its judgment for that of the agency.' " *Ibid.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1970) (citations omitted)).

Generally, courts employ a three-part test for determining the validity of administrative regulations. First, a court should "inquire whether the regulations were promulgated in excess of statutory authority." *Ibid.* Second, the regulations must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1970). Finally, the courts should determine whether the agency "followed the necessary procedural requirements" promulgating the regulations. *Wayne State,* 590 F.2d at 633. *Accord Ligon Specialized Hauler, Inc. v. Interstate Commerce Comm'n,* 587 F.2d 304, 314–15 (6th Cir.1978). Agencies are bound to follow their own regulations and rules, *Confederated Tribes,* 746 F.2d at 474, and to stay within the bounds of the powers delegated to them by Congress. *United States v. Amdahl Corp.,* 786 F.2d 387, 392–93 (Fed.Cir.1986). Furthermore,

"an agency charged with implementation of a statutory framework ordinarily possesses no authority to deviate from or abdicate its statutory responsibilities." *United States v. City of Detroit,* 720 F.2d 443, 451 (6th Cir.1983). Finally, a statutory scheme should be read so as to avoid creating internal conflicts when a more consistent interpretation is available. *Louisiana Public Service Comm'n v. Federal Communications Commission,* 476 U.S. 355, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986).

## III

■ Because the delegation memorandum from the Commissioner of Rehabilitation Services to the RSA Regional Commissioners (ARCs) is the focus of the delegation challenge, we outline its salient features here. First, the Commissioner "redelegated" the authority delegated to him by the Assistant Secretary. The Commissioner then listed the authorities delegated to the ARCs under the various statutory powers. The memorandum states that under Section 9 of the Act, the ARCs would have the authority "to act on all appeals of *Department* audit exceptions of $100,000 or less on grant authorities delegated below...." (emphasis in original). The authorities to submit reports to Congress or the President, to appoint members of advisory councils and fix compensation, to approve awards for services and consultant contracts, and to disapprove state plans were reserved to the Secretary or the Assistant Secretary. Finally, the memorandum precluded any further redelegation. Neither section 3(b), 29 U.S.C. § 702(b), requiring the Secretary to take steps to assure that program funds are properly spent, nor section 12(c), 29 U.S.C. § 711(c), authorizing the Commissioner to issue necessary regulations, is mentioned in the memorandum.

The statutory scheme under which this delegation was made states that "the Secretary may delegate any function to such officers and employees of the Department as the Secretary may designate, and may authorize such successive redelegations of such functions within the Department as

may be necessary and appropriate." 20 U.S.C. § 3472 (1979). The Rehabilitation Services Administration was created by statute, as was the position of Commissioner. 29 U.S.C. § 702(a). The only statutory limit on the power to delegate is: "[t]he functions of the Commissioner shall not be delegated to any officer not directly responsible, both with respect to program operation and administration, to the Commissioner." *Ibid.* The Commissioner is given the authority to "promulgate such regulations as are considered appropriate to carry out his duties under" the Act. 29 U.S.C. § 706(c). The authority to audit is given to the Secretary "or any of [his] duly authorized representatives." 29 U.S.C. § 708.

The state here argues that the delegation procedures employed by the Commissioner in this case were faulty. First, the state claims that the Commissioner, who must be appointed by the President, 29 U.S.C. § 702(a), did not sign the delegation document but, instead, the document was signed by the *acting* Commissioner, Mr. Sachs. Second, the state claims that each delegation document must contain all original reservations of authority according to a Departmental Directive issued by the Assistant Secretary. Although it is true that the Commissioner did not sign the document, Mr. Sachs was, in fact, the acting Commissioner. If a governmental Department could not function under the authority of temporary personnel during the absence of the principal, the entire functioning of government could collapse during such times. The Departmental Directive relied on by the state specifically states that "[a]uthority delegated to a position by title may be exercised by a person officially designated to serve in such position in an acting capacity, or on a temporary basis. . . ."

Second, the delegation documents are, in fact, required by the Departmental Directive, to "contain all original reservations of authority." Further, it is true that the delegation document being challenged here omitted to mention one reservation of power which was listed in the Secretary's delegation to the Assistant Secretary, and in the Assistant Secretary's delegation to the Commissioner. However, as the EAB found, the delegation document *did* incorporate by reference the previous delegation document from the Assistant Secretary to the Commissioner. Further, all of the powers which had been delegated to the Commissioner, which included the authority to administer the Act in full, were not redelegated to the ARCs; instead, only some of that authority, including the authority to act on appeals of audit exceptions of $100,000 or less, was redelegated. The reservations which were not repeated were the Assistant Secretary's reservations of the authority to review regulations prior to their approval by the Secretary; the only other item under the heading of "reservations" which was not repeated was the item which rendered the decisions by the Commissioner to initiate action subject to review. Since the redelegation under challenge here did not delegate *all* of the Commissioner's powers, but instead listed very specific powers to be delegated, *not* including the power to initiate action, there was no reason to repeat that reservation. Finally, the Departmental Directive explains that the reason for repeating the reservations of powers in each redelegation is so that the delegatee will not mistakenly redelegate power which is not his to begin with. Here, the challenged delegation document states that no powers delegated to the ARCs could be redelegated. Thus, the policy behind the need for repetition of the reservations does not come into play here.

■ The substantive challenge to the delegation in this case is that the authority to issue Final Letter Determinations was not delegated to the ARCs. This challenge calls into question all Final Letters of Determination issued by any ARC pursuant to this delegation. 20 U.S.C. § 1234a(a) states that when a Secretary determines a disallowance, the Secretary must issue a Final Letter of Determination. However, first, it is clear that a specific statutory delegation does not prohibit a delegation of that power to others, or to the ARCs. Second, that power is not reserved from further delegation in either of the previous

delegation documents. Third, although "[f]unctions constituting final agency action, ..., must be [performed] *or ratified*" by the person(s) to whom Congress delegated the ultimate authority, *Relco, Inc. v. Consumer Product Safety Comm'n*, 391 F.Supp. 841, 845 (S.D.Tex.1975) (emphasis added), in this case, the Secretary, through the EAB and after receiving and considering MDOE's objections to the EAB decision, ratified the ARC's actions. Thus, even though the delegation to the ARCs limited the ARCs' power to decide appeals on audit decisions to cases under $100,000, because the Secretary ratified the Final Letter of Determination in this case, that Letter became an order of the Secretary through the ratification. Further, in a memorandum from the Commissioner to the ARCs regarding the issuance of Final Letters of Determination, the Commissioner makes clear, by instructing the ARCs on the procedures to follow in issuing such letters, that the Commissioner intended to have delegated that power to the ARCs. Finally, as the Secretary argues, a Final Letter of Determination is the last step in the audit process, and so the authority to issue such letters goes along with the expressly delegated authority to audit.

In that the statutory provisions do not limit the Secretary's authority to delegate the Secretary's powers, it appears that there are no grounds for objecting to the delegations made here. Further, it appears that the authority to issue Final Letters of Determination was in fact delegated, or at least ratified. Thus, the arguments made by the state regarding the delegations made here must fail.

## IV

■ As stated above, the standard of review is statutorily mandated. The EAB's findings of fact must be upheld if supported by substantial evidence; "but the court, for good cause shown, may remand the case to the Board to take further evidence...." 20 U.S.C. § 1234d(c). The state here alleges that substantial evidence does not support the EAB's conclusion because, first, sampling was used to extrapo-

late a refund allegedly not paid to the federal government in an isolated instance of tuition remission; and second, because the universe of expenditures included those related to Michigan's State Technical Institute and Rehabilitation Center, which the state claims should not have been included in client services expenditures.

Substantial evidence means " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *Ajax Paving Industries, Inc. v. NLRB*, 713 F.2d 1214, 1217 (6th Cir.1983). "Although recovery of misused [federal] funds clearly is intended to promote compliance with the requirements of a grant program, a demand for repayment is more in the nature of an effort to collect upon a debt than a penal sanction." *Bennett v. Kentucky Dept. of Educ.*, 470 U.S. 656, 662–63, 105 S.Ct. 1544, 1548–49, 84 L.Ed.2d 590 (1985). "Where the Secretary has concluded that funds were misused under the legal standards in effect when the grants were made, a reviewing court has no independent authority to excuse repayment based on its view of what would be the most equitable outcome." *Bennett v. New Jersey*, 470 U.S. 632, 646, 105 S.Ct. 1555, 1563, 84 L.Ed.2d 572 (1985). "The interpretation put on the statute by the agency charged with administering it is entitled to deference, ... but the courts are the final authorities on issues of statutory construction." *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981) (citations omitted). However, so long as the agency's interpretation of the statute is "a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]," *Chemical Mfrs. Ass'n v. Natural Res. Defense Coun.*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1975) (citations omitted), it must be upheld. *Accord Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018,

1026, 16 L.Ed.2d 131 (1966). "Of course, if Congress has clearly expressed an intent contrary to that of the Agency, our duty is to enforce the will of Congress." *Ibid.*

In the instant case, the applicable statutes mandate that the Secretary create the EAB to preside over audit appeals. 20 U.S.C. § 1234(a)(1). The statute provides that the Secretary's or EAB's final decision shall establish the amount of the audit determination owing to the federal government. 20 U.S.C. § 1234a(e). However, nothing in the statute requires that audit determinations be made using a particular computing method.

The state acknowledges that it had the burden of showing the "allowability of expenditures disallowed in the final audit determination." 20 U.S.C. § 1234a(c). However, the state claims that this burden does not include the burden of showing that a refund was returned, because a refund is not the same as an allowable expenditure. The Secretary argues that so long as the sample case was selected randomly, the fact that this particular case involved an improper failure to refund rather than an unallowable expenditure does not alter the burden of proof.

This argument raises the issue of the validity of the use of random sampling. In *State of Georgia v. Califano*, 446 F.Supp. 404 (N.D.Ga.1977), the state challenged the use of a statistical sample in determining the amount of an overpayment made to doctors within the state. The court upheld the use of a statistical sample, stating that "[p]rojection of the nature of a large population through review of a relatively small number of its components has been recognized as a valid audit technique...." *Id.* at 409 (citing *New Jersey Welfare Rights Organization v. Cahill*, 349 F.Supp. 501 (D.N.J.1972), *aff'd*, 483 F.2d 723 (3d Cir. 1973)); and *Rosado v. Wyman*, 322 F.Supp. 1173 (E.D.N.Y.1970), *aff'd*, 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971)).

Moreover, mathematical and statistical methods are well recognized as reliable and acceptable evidence in determining adjudicative facts. *See Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (finding of discrimination based entirely on jury selection statistics and absence of explanation); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (same); *Maxwell v. Bishop*, 398 F.2d 138, 141–48 (8th Cir.1968), *rev'd on other grounds*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970) (racial discrimination in application of death penalty); *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907, 910–14 (N.D.Ill. 1969) (housing discrimination); *Zippo Manuf. Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670 (S.D.N.Y.1963) (unfair competition; sample of consumers).

*Ibid.* This "is not to say that the statistical model will always be conclusive. The weight to be given to such statistical evidence is necessarily one which must be considered by the fact finder in light of the practical difficulties in obtaining a claim-by-claim review." *Id.* at 410.

In the instant case, as in *State of Georgia*, audit of the thousands of cases comprising the universe of cases would be impossible. *Ibid.* In addition, as in *State of Georgia*, a final determination is not made until the state has had an opportunity to present its own evidence of an error in the audit. *Ibid.* In the case at hand, the ARC considered each of the state's objections to the methodology as well as to the use of the specific cases that were randomly selected. Michigan disputed nine of the thirteen disallowances, and the ARC reversed the auditors in one case. Further, the ARC recalculated the disallowance using the ratio-estimation approach, which the ARC used for the purpose of addressing Michigan's concerns. The disallowance was reduced by the ARC from $718,598 to $465,732.

Each sample case was then reviewed by the EAB, which, placing the burden of proof on the state as mandated by 20 U.S. C. § 1234a(c), found insufficient evidence to rebut the ARC's finding of misexpenditure. Finally, the case was sent to the Secretary for review; the EAB's decision was sustained at that level. Thus, the state had ample opportunity to challenge the ARC's findings. Just as in *State of*

*Georgia,* this court will "conclude[ ] that it was not arbitrary and capricious for the Administrator to use that statistical sample as a basis for his findings of fact." *Ibid.*

In that *State of Georgia* is the most closely analogous case that we can locate, and that Michigan cannot demonstrate another feasible way to make the necessary determination, or carry the burden of showing the error in the Secretary's analysis, we hold that the Secretary's conclusion must be upheld. There is no case law that states how large a percentage of the entire universe must be sampled. However, when, as here, the state is given every opportunity to challenge each disallowance as well as the audit technique itself, it appears that the state has been treated as fairly as is practicable under the circumstances. The careful consideration by the ARC is also shown by the fact that he reduced the disallowance by over one-third, based on Michigan's objections.

■ The issue of the inclusion of expenditures made on the vocational rehabilitation center can be disposed of easily. The Manual for Rehabilitative Services clearly states that expenditures at rehabilitation facilities operated by state rehabilitation agencies are to be attributed to client case services. Thus, it clearly was not improper to include these expenditures in the universe of expenditures. The state argues that a distinction is made between residential facilities and other facilities in the manual. However, having read the cited page, as well as the other parts of the Manual included in the appendix, we see only directions to the agency to include expenditures made on residential facilities in either of two categories: "Services for Individuals" or "Counseling and Placement." These two categories come under the general heading of client services. Thus, there is no basis for distinguishing these expenditures from those made at non-residential facilities. Especially in light of the standard of review, a court "must not reject an agency's choice between two conflicting views even though we may have justifiably made a different choice had the matter been before us *de*

*novo."* *Fort Valley College v. Bennett,* 853 F.2d 862, 864 (11th Cir.1988). The EAB's determination of this issue must prevail.

## V

The state's final challenge on appeal is to the possible imposition of interest on the disallowances, accruing from the date of the final decision. Here, the EAB declined to rule on this issue, finding that it lacked jurisdiction to determine the propriety of charging interest in this situation in that its enabling statute and accompaying regulations allow it to determine only whether there is debt and the amount of that debt, and nothing else. The Federal Debt Collection Act, 31 U.S.C. § 3701 *et seq.,* provides that a federal agency shall charge interest on debts owed "by a person" to the federal government. 31 U.S.C. § 3717(a)(1). However, the Act defines "person" to *exclude* an agency of a state government. 31 U.S. C. § 3701(c). Thus, it would seem that the imposition of interest in this case is not mandatory under the Act.

In some cases, courts have found that the question of the imposition of prejudgment interest was not ripe for review when the state cannot show a "direct and immediate" hardship, which must "entail more than 'possible financial loss.' " *California v. Bennett,* 833 F.2d 827, 833–34 (9th Cir. 1987) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 153, 87 S.Ct. 1507, 1517–18, 18 L.Ed.2d 681 (1967)). In fact, in the instant case, because the USDOE has retracted its efforts to collect the interest, we find that this issue is not ripe for decision by this court. The agency must first decide whether, in light of this opinion, it wishes to seek interest, and must begin actions to collect that interest, before the agency decision can be reviewed by a federal court.

## VI

Thus, we AFFIRM the EAB's decision on the issues of delegation and the evidentiary issues, and we find that the issue regard-

ing prejudgment interest is not ripe for review.